**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DICHTER-MAD FAMILY PARTNERS,
LLP; PHILIP JAY DICHTER; CLAUDIA
GVIRTZMAN DICHTER; RICHARD M.
GORDON,

  *Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA,

  *Defendant-Appellee*.

No. 11-55577

D.C. No.
2:09-cv-09061-
SVW-FMO

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
January 10, 2013—Pasadena, California

Filed February 12, 2013

Before: Stephen Reinhardt, Kim McLane Wardlaw,
and Richard A. Paez, Circuit Judges.

Order;
Per Curiam Opinion

## SUMMARY[*]

### Federal Tort Claims Act

The panel affirmed the district court's dismissal of an action alleging claims under the Federal Tort Claims Act.

The panel held that the district court correctly concluded that it lacked jurisdiction to entertain appellants' claims because they fell within the "discretionary function" exception to the United States' waiver of sovereign immunity in the Federal Tort Claims Act. The panel affirmed the district court's judgment of dismissal for lack of subject matter jurisdiction, and adopted Parts I through V of the district court's April 20, 2010 opinion, *Dichter-Mad Family Partners, LLP v. United States*, 707 F. Supp.2d 1016 (C.D. Cal. 2010). The panel also held that the additional allegations made in the Second Amended Complaint were insufficient to overcome the discretionary function exception to the Act's waiver of sovereign immunity. Finally, the panel held that the district court did not abuse its discretion in denying appellants' request for additional discovery.

## COUNSEL

Richard H. Gordon (argued), Beverly Hills, California, and Philip J. Dichter, Malibu, California, for Appellants.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Sparkle Sooknanan (argued), Lindsey Powell, Mark B. Stern, and Tony West, United States Department of Justice, Washington, D.C.; and André Birotte, Jr., United States Attorney, Los Angeles, California, for Appellee.

---

## ORDER

The opinion and appendix filed on January 28, 2013 are withdrawn.   A new opinion and appendix are filed concurrently with this order.

**IT IS SO ORDERED.**

---

## OPINION

PER CURIAM:

After careful de novo review of the record in this appeal, we conclude that the district court correctly concluded that it lacked jurisdiction to entertain Appellants' claims because they fall within the "discretionary function" exception to the United States' waiver of sovereign immunity in the Federal Tort Claims Act.  28 U.S.C. § 2680(a).  Thus, we affirm the district court's judgment of dismissal for lack of subject matter jurisdiction and adopt Parts I through V of the district court's comprehensive and well-reasoned April 20, 2010 opinion, *Dichter-Mad Family Partners, LLP v. United States*, 707 F. Supp. 2d 1016 (C.D. Cal. 2010), as our own, and attach it to this opinion as an Appendix.

We further hold, as the district court also concluded in an unpublished order dismissing Appellants' claims with prejudice, that the additional allegations made in the Second Amended Complaint[1] are insufficient to overcome the discretionary function exception to the Federal Tort Claims Act's waiver of sovereign immunity.  Virtually all of the newly alleged mandatory duties are not in fact mandatory directives that would deprive the United States of its discretionary function immunity.  *See Terbush v. United States*, 516 F.3d 1125, 1138 (9th Cir. 2008); *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996) ("[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations.").   Those policies that are arguably mandatory lack the causal relationship to the plaintiffs' alleged injuries required to establish jurisdiction, even under a generous reading of the complaint.  "Where, as here, the harm actually flows from the prosecutor's exercise of discretion, an attempt to recharacterize the action as something else must fail."  *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1286 (9th Cir. 1998).

Finally, the district court did not abuse its discretion in denying Appellants' request for additional discovery. "As we have explained, 'broad discretion is vested in the trial court to permit or deny discovery, and its decision to deny discovery will not be disturbed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant.'" *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (alteration

---

[1] The duties alleged in the Second Amended Complaint are taken from the SEC Enforcement Manual, which the district court ordered the government to produce.

omitted) (quoting *Goehring v. Brophy*, 94 F.3d 1294, 1305 (9th Cir. 1996)). A plaintiff seeking discovery must allege "enough fact to raise a reasonable expectation that discovery will reveal" the evidence he seeks. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Gager v. United States*, 149 F.3d 918, 922 (9th Cir. 1998) ("It is well-established that the burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists.") (internal quotation marks and alterations omitted). The district court's reasoned finding that the plaintiffs failed to meet this burden was a proper exercise of its discretion. *See Hallett*, 296 F.3d at 751.

**AFFIRMED.**

# APPENDIX

**DICHTER–MAD FAMILY PARTNERS, LLP; Philip Dichter; Claudia Gvirtzman Dichter; and Richard H. Gordon, Plaintiffs,**

**v.**

**UNITED STATES of America; Securities Exchange Commission, and Does 1–10, Defendants.**

**No. CV 09–9061 SVW (FMOx).**

United States District Court,
C.D. California.

April 20, 2010.

**Background:** Investors in Ponzi scheme brought a Federal Tort Claims Act (FTCA) action against the Securities and Exchange Commission (SEC) and the United States, claiming SEC's negligent acts and omissions caused scheme to continue, perpetuate, and expand, and that the SEC failed to terminate Ponzi scheme despite its multiple opportunities to do so. Defendants filed motions to dismiss.

**Holding:** The District Court, Stephen V. Wilson, J., held that discretionary function exception barred investors' claims against government based on SEC investigators' failure to discover Ponzi scheme and publicize or prosecute it.

Motions granted.

**1. United States ⚷78(12)**

Under discretionary function exception to Federal Tort Claims Act (FTCA), officers are only liable if (1) the officers' actions were prescribed by statute, regulation, or policy, or (2) the officers' conduct was not susceptible to analysis on social, economic, or political policy grounds. 28 U.S.C.A. § 2680(a).



**2. Federal Civil Procedure ⚷1832**

Because Securities and Exchange Commission's (SEC) Office of Inspector

General's report on agency's failure to uncover Ponzi scheme was both attached to and incorporated-by-reference into complaint, it was properly considered on motion to dismiss investors' Federal Tort Claims Act (FTCA) action against SEC for failing to terminate Ponzi scheme despite multiple opportunities to do so. 28 U.S.C.A. § 2674 et seq.; Fed.Rules Civ. Proc.Rule 10(c), 28 U.S.C.A.

**3. United States** ⚐**78(1)**

A federal agency cannot itself be sued under Federal Tort Claims Act (FTCA); FTCA only allows claims against the United States. 28 U.S.C.A. § 2671.

**4. Federal Civil Procedure** ⚐**1772**

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged; a complaint that offers mere labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

**5. United States** ⚐**78(12)**

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed, for purposes of discretionary function exception to Federal Tort Claims Act (FTCA), that the agent's acts are grounded in policy when exercising that discretion; in contrast, if the applicable statute or regulation does not give the employee discretion, no presumption attaches, and the court must determine whether the decisions were of the kind that are susceptible to policy analysis. 28 U.S.C.A. § 2680(a).

**6. United States** ⚐**141(3)**

United States bears the burden of proving the applicability of discretionary function exception to Federal Tort Claims Act (FTCA); government must prove that each of the allegedly wrongful acts, by each allegedly negligent actor, is covered by the discretionary function exception. 28 U.S.C.A. § 2680(a).

**7. United States** ⚐**78(12)**

Discretionary function exception to Federal Tort Claims Act (FTCA) barred investors' claims against government based on Securities and Exchange Commission's (SEC) investigators' failure to discover Ponzi scheme and publicize or prosecute it; SEC's decisions of whether and how to conduct investigations and enforcement actions were discretionary, and investors' conclusory allegations failed to establish that SEC examiners were guided by any mandatory duties requiring them to share information and coordinate their activities. Securities Exchange Act of 1934, § 21(a)(1), (d)(1), 15 U.S.C.A. § 78u(a)(1), (d)(1); 28 U.S.C.A. § 2680(a); 17 C.F.R. § 202.5.

**8. United States** ⚐**78(12)**

Employment, supervision, and training decisions fall squarely within the discretionary function exception to Federal Tort Claims Act (FTCA). 28 U.S.C.A. § 2680(a).

**9. Federal Civil Procedure** ⚐**1275.5**
   **Federal Courts** ⚐**33**

Where pertinent facts bearing on the question of subject matter jurisdiction are in dispute, discovery should be allowed; however, a court's refusal to allow further discovery before dismissing on jurisdictional grounds is not an abuse of discretion when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction.

**10. Federal Civil Procedure** ⚐**1275.5**
   **Federal Courts** ⚐**33**

Additional discovery was not warranted prior to dismissal of Federal Tort

Claims Act (FTCA) claim for lack of subject matter jurisdiction where plaintiffs failed to articulate a discrete discovery request that might cure the jurisdictional deficiency and failed to otherwise specify where they might discover the necessary factual predicate for subject matter jurisdiction. 28 U.S.C.A. § 2680(a).

**11. Federal Civil Procedure ⟲852.1**

When an amended complaint is filed, the previous complaint is rendered null and void, and only the amended complaint remains legally operable; a plaintiff waives all causes of action alleged in the original complaint which are not alleged in the amended complaint.

———

Philip J. Dichter, Philip J. Dichter Law Offices, Malibu, CA, for Plaintiffs.

Richard M. Gordon, Beverly Hills, CA, pro se.

Jeffrey Paul Ehrlich, United States Department of Justice, Washington, DC, for Defendants.

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF JURISDICTION [6, 7]

STEPHEN V. WILSON, District Judge.

**I.  INTRODUCTION**

**A.  BACKGROUND**

Plaintiffs were investors in Bernard Madoff's Ponzi scheme.[1]  Plaintiffs are bringing a Federal Tort Claims Act ("FTCA") action against the Securities and Exchange Commission ("SEC") and the United States ("Government" or "Defendant"). Plaintiffs assert that the SEC "owes a duty of reasonable due care to all members of the general public including all investors in U.S. financial markets who are foreseeably endangered by its conduct." (Compl. ¶ 163.)  Plaintiffs also assert that the SEC's negligent acts and omissions "caused Madoff's scheme to continue, perpetuate, and expand," and that the SEC "fail[ed] to terminate Madoff's Ponzi scheme despite its multiple opportunities to do so." (Compl. ¶ 2; *see also* Compl. ¶ 164.)  Plaintiffs further assert that "Plaintiffs here were among those victimized by Madoff.  Plaintiffs made their investments in reliance on Madoff's reputation, clean regulatory record, and the SEC's implied stamp of approval." (Compl. ¶ 8.) Because of the SEC's alleged negligence, Plaintiffs seek to recover their losses from their investments with Madoff.

[1]  Defendants have brought a pair of Motions to Dismiss, arguing that the Court lacks jurisdiction to hear the claims under the FTCA, 28 U.S.C. § 2674 *et seq.*  Under the "discretionary function exception" to the FTCA, federal courts are barred from adjudicating tort actions arising out of federal officers' discretionary acts.  28 U.S.C. § 2680(a).  In brief, officers are only liable if (1) the officers' actions were prescribed by statute, regulation, or policy, or (2) the officers' conduct was not susceptible to analysis on social, economic, or

---

1.  The plaintiffs are:
   –Dichter–Mad Family Partners, LLP (a Florida partnership represented by attorney Philip Dichter, an investor in the partnership),
   -Philip Dichter (who is a lawyer representing himself),

   -Claudia Gvirtzman Dichter (represented by Philip Dichter), and

   -Richard M. Gordon (who is a lawyer representing himself).

political policy grounds. *See United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).[2]

[2] The Complaint contains over fifty pages of allegations summarizing the SEC's failure to uncover Madoff's fraud. The Complaint also attaches five exhibits, the most substantial of which is the SEC Office of Inspector General's 450–page *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme—Public Version* [hereinafter "the Report"], which was released in August 2009. (Compl., Ex. A.)[3] Plaintiffs purport to adopt the "factual allegations or determinations made in the report" by "fully incorporat[ing] by reference" the Report as a part of the Complaint. (Compl. ¶ 1 n. 3.) This request is technically impermissible under Fed.R.Civ.P. 10(c), which only permits the incorporation of a legally operable "written instrument" such as a contract, check, letter, or affidavit. *See, e.g., Rennie & Laughlin, Inc. v. Chrysler Corp.,* 242 F.2d 208, 209 & n. 209 (9th Cir.1957); *see also* Wright & Miller, 5A *Federal Practice & Procedure* § 1327 n. 1 (3d ed. 2009 update). In contrast, items such as "newspaper articles, commentaries and editorial cartoons" are not properly incorporated into the complaint by reference. *Perkins v. Silverstein,* 939 F.2d 463, 467 n. 2 (7th Cir.1991); *see also* Wright & Miller, 5A *Federal Practice & Procedure* § 1327 n. 2.

That said, Defendants have not objected to Plaintiffs' attempt to incorporate the Report by reference into the Complaint. (*See generally* Defs.' Motion; Defs.' Reply.) Additionally, Fed.R.Civ.P. 8(e) requires the Court to "construe[ ] pleadings so as to do justice." In order for the Court to comply with Rule 8(e) and give

Plaintiffs the benefit of any plausible inferences contained in the Report (as Plaintiffs repeatedly urged the Court to do, *see, e.g.* Compl. ¶ 1 n. 3, Sur-reply at 5 n. 1), the Court has reviewed the full Report and treats it as though it were fully included in Plaintiffs' Complaint. Although this is an unusual procedure, there is clear legal authority permitting the Court to do so: Plaintiffs' Complaint "reference[s]" the Report "extensively," and the factual allegations contained in the Report are "integral to [their] claim." *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003) (citations omitted). Thus, it is appropriate in this particular instance to consider the Report as part of Plaintiffs' allegations for purposes of the present Motion to Dismiss.

Although the inclusion of the Report results in an unusually long Complaint, the Ninth Circuit has counseled that an overly detailed complaint is acceptable under Fed.R.Civ.P. 8(a) if, for example, it is "organized, [and is] divided into a description of the parties, a chronological factual background, and a presentation of enumerated legal claims, each of which lists the liable Defendants and legal basis therefor." *Hearns v. San Bernardino Police Dept.,* 530 F.3d 1124, 1132 (9th Cir.2008). In the present case, both the Complaint and the Report satisfy these criteria. Accordingly, because the Report is both attached to and incorporated-by-reference into the Complaint, it is properly considered on the Motion to Dismiss. (*See also infra* Part III.A.)

Many of Plaintiffs' allegations (including the factual averments contained in the Report) identify decisions that, in hindsight, could have and should have been made differently. Other allegations reveal the

---

2. There are, of course, various other requirements and exceptions in the FTCA. This brief summary only relates to the matter at issue here—the discretionary function exception.

3. This Order refers to the Office of Inspector General's report as "the Report," and pincitations to the Report are abbreviated as "Ex. A."

SEC's sheer incompetence in regulating Madoff's broker-dealer, market-making, and investment-management operations. What is lacking in the present Complaint, however, is any plausible allegation revealing that the SEC violated its clear, non-discretionary duties, or otherwise undertook a course of action that is not potentially susceptible to policy analysis.

### B.  FACTUAL ALLEGATIONS

The facts of the Madoff fraud need little introduction. A thorough summary of Madoff's operations can be found in the recent decision *In re Bernard L. Madoff Inv. Secs. LLC*, 424 B.R. 122, 127–32 (Bkrtcy. S.D.N.Y.2010) (order affirming trustee's determination of former investors' net equity).

In the present case, Plaintiffs' central allegations are largely drawn from the Inspector General's Report, which Plaintiffs have incorporated by reference into the Complaint. (Compl. ¶ 1 n. 3.) The Complaint alleges the following.

The first warning sign of Madoff's fraud came in 1992, when Avellino & Bienes, a firm that invested exclusively through Madoff's brokerage, was exposed as a Ponzi scheme. (Compl. ¶¶ 29–40; Ex. A at 42–61.) Plaintiffs explain that the SEC's investigators were "woefully inexperienced" in the area of Ponzi schemes (Compl. ¶ 32) and failed to obtain trading records from the Depository Trust Corporation that could have revealed that Madoff's operations were fraudulent. (Compl. ¶¶ 35, 37.) Because the SEC was focused on Avellino & Bienes rather than Madoff, the SEC staff failed to make a number of other "common sense" inquiries into Madoff's

operations that "should have" been done. (Compl. ¶¶ 34, 37, 39.)

The second warning sign came in May 2000, when industry analyst Harry Markopolos provided an eight-page complaint to the Boston SEC office. (Compl. ¶¶ 42–46; Ex. A at 61–67.) The complaint provided evidence "questioning the legitimacy of Madoff's reported returns." (Compl. ¶ 42.) Markopolos presented his findings to an unqualified senior staff member (Compl. ¶ 44), and although the staffer stated that he forwarded the matter to the New York office, he did not actually do so. (Compl. ¶ 45.)

The third warning sign came in March 2001, when Markopolos submitted a second complaint to the Boston office containing new, simplified information. (Compl. ¶¶ 47–50; Ex. A at 67–74.) This time, the matter was forwarded to New York, but "after just one day" the lead enforcement attorney in New York "rejected it out of hand." (Compl. ¶ 49.) Although Markopolos's complaint was more detailed than the average complaint, the attorney wrote a short email stating "I don't think we should pursue this matter further." (Compl. ¶¶ 49–50.)[4]

The fourth warning sign came in May 2001, when industry publications *MAR-Hedge* and *Barron's* published articles discussing the secrecy of Madoff's operations and the improbability of his consistently strong returns. (Compl. ¶¶ 51–57; Ex. A at 74–77, 80–81, 86.) An SEC staff member in the Boston office asked the New York team reviewing Markopolos's complaint if they were interested in reading the articles. (Compl. ¶ 55.) The New York team apparently did not read the

---

**4.** In full, the email stated: "As we discussed, after reviewing the complaint received (via the [Boston office] ) from Harry Markopol[o]s of Rampart Investments about purported performance claims for funds managed by Ber-

nard Madoff, and some information about Madoff and others identified in the complaint, I don't think we should pursue this matter further." (Ex. A at 72.)

articles. (*Id.*) At the same time, the articles piqued a Washington supervisor's interest. (Compl. ¶ 56.) Although the supervisor wrote a note on the article stating that "[t]his is a great exam[ination] for us!," no further actions were taken in the Washington office. (Compl. ¶ 56; Ex. A at 86.)

The first major investigative event came in May 2003, when a hedge fund manager provided a complaint to the SEC's Office of Compliance Inspections and Examinations in Washington D.C. (Compl. ¶¶ 58–81; Ex. A at 77–145.) The fund manager's complaint summarized a number of red flags that suggested that Madoff was running a Ponzi scheme. (Compl. ¶ 59.) The Investment Management team in Washington, which was more qualified to handle an investigation into a Ponzi scheme, referred the matter to the Washington office's Broker–Dealer team. (Compl. ¶¶ 61–62.) The two teams never conferred on the investigation. (Compl. ¶ 62.) Compounding this failure to confer, the Broker–Dealer team employed a number of inexperienced staff members at that time. (Compl. ¶¶ 63–64.) One team member explained that "[a]t the time . . . we were expanding rapidly," (Compl. ¶ 63, quoting Ex. A, at 90) and various staff members recalled that they received little-to-no formal training. (Compl. ¶¶ 63–64.)

Upon receiving the case, the Washington Broker–Dealer team inexplicably failed to begin its investigation for nine months and failed to log its investigation into the SEC's Super Tracking and Reporting System (STARS), a computer database used to track examinations. (Compl. ¶¶ 65–67; Ex. A at 85 n. 54.) This failure to log the investigation was consistent with the SEC's regular practice at the time. (*Id.*)

Once the investigation commenced, the team focused its attention on potential front-running [5]—with which it was more familiar—rather than a Ponzi scheme. (Compl. ¶¶ 65–67.) The team created a written plan, but the plan was "too narrowly focused" (Ex. A at 142) and the team did not follow through by obtaining relevant information from third parties. (Compl. ¶ 70.) At one point, the Broker–Dealer team drafted a letter "to the [National Association of Securities Dealers] to confirm Madoff's trading activity," but refrained from sending the letter because, according to one staff member, "it would have been too burdensome and time-consuming for the staff to review the documents that the [National Association of Securities Dealers] would have supplied in response." (Compl. ¶¶ 69–98.) Similarly, "the team failed to consult Exchange," even though Madoff's purported options trades were being processed through it. (Compl. ¶ 74.) Instead of receiving this information from third parties that "would have assisted in independently verifying [Madoff's] trading activity," the team "rel[ied] solely on verbal answers" from Madoff, which, according to the Office of the Inspector General's consultants, "is not an appropriate method of examination." (Compl. ¶¶ 70, 72, quoting Ex. A at 111 n. 74, 206 n. 143.) The team supervisor admitted that it was "asinine" for the team not to obtain a proper audit trail, which Plaintiffs characterize as a "common-sense procedure" in such an investigation. (Compl. ¶ 77, quoting Ex. A at 109.)

The Washington team stopped its investigation in April 2004 because SEC supervisors "determined that a new investigation probing mutual funds was more important than following up on Madoff."

---

**5.** Front-running is the practice in which a "broker execut[es] orders on a security for its own account while taking advantage of advance knowledge of pending orders from its customers." (Compl. ¶ 66.) *See also Black's Law Dictionary* 739 (9th ed. 2009) (defining term in similar manner).

(Compl. ¶ 78.) [6] At the end of the investigation, the team failed to produce a final report, which according to the Report was a "critical error" that later led to unnecessary duplication of efforts. (Compl. ¶ 78, quoting Ex. A at 144.)

The second major investigation started in the Northeast Regional (New York) Office in April 2004, just as the Washington investigation was being put on indefinite hold. (Compl. ¶¶ 82–109.) The New York investigation was prompted by the SEC's discovery of internal emails from a hedge fund that had invested with Madoff through a feeder fund that invested directly in Madoff's funds. Upon conducting due diligence, the hedge fund had decided to withdraw its investments from the Madoff feeder fund. (Compl. ¶¶ 82–83.) The emails summarized the investor's concerns about Madoff's activities, and essentially tracked the issues raised in the Markopolos reports and the articles that had appeared in *MARHedge* and *Barron's.* (Compl. ¶¶ 83–84.)

The New York investigation proceeded in a similar manner as the Washington investigation. (Compl. ¶ 86.) The case was transferred from an Investment Management team to an ill-equipped Broker–Dealer team; the Broker–Dealer team was not even assembled for seven months, and did not begin working for yet another three months; and, once the investigation commenced, the Broker–Dealer team never consulted the Investment Management team for guidance and advice. (Compl. ¶¶ 86, 88.) Unlike the team that conducted the Washington investigation, the New York Broker–Dealer team failed to even draft a planning memorandum, let alone follow it. (Compl. ¶ 87.) When conducting the investigation, the team accepted Madoff's assertions at face value, even though they knew or should have known that Madoff was lying—for example, by saying that he was no longer trading options (which was contradicted by readily available records, *see* Ex. A at 172, 207) and that he was satisfied with foregoing hundreds of millions of dollars in potential management fees and receiving only brokerage commissions instead. (Compl. ¶¶ 90–92.) The team focused its investigation on their own area of expertise (front-running and "cherry-picking" [7]), while ignoring other potential areas of investigation such as looking for a Ponzi scheme. (Compl. ¶¶ 88–89.) [8] They generally failed to corroborate information with third parties or follow up on red flags such as Madoff's auditor's conflict of interest and obvious inadequacy to audit a complex operation like Madoff's. (Compl. ¶¶ 94–96.)

In spite of these failings, the New York investigation came remarkably close to uncovering Madoff's fraud in June 2005. The team conducted a two-to-three month

---

6. One examiner later wrote that "[i]n early 2004, [the Office of Compliance Inspections and Examinations] made it a priority to examine mutual funds' undisclosed payments to broker-dealers," (Ex. A at 125, quoting July 1, 2009 letter from Lori Richards to Inspector General David Kotz), and contemporary records confirm this. (Ex. A at 125–26.)

7. "[C]herry-picking is generally a scheme in which trades, once they are determined to be favorable, are allocated to a favored account at the expense of other accounts." (Ex. A at 146 n. 92.)

8. One of the investigators explained that he interpreted the initial complaint and referral as suggesting that the investigation "focus exclusively on whether Madoff was using his market making capability to cherry pick trades or to front run market making trades for the benefit of his hedge fund clients." (Ex. A at 167, paraphrasing testimony of John Nee.) Another team members explained that "he focused on abusive trading practices rather than the other issues raised in the [referral] e-mail, in part, because order leakage was a prominent issue at the time of the examination." (Ex. A at 168, paraphrasing testimony of Robert Sollazzo.)

on-site investigation (*see* Ex. A at 179) and had a formal interview with Madoff in late May (Ex. A at 193–95). Embarrassingly for the SEC, it was during the May meeting that the New York team first learned—from Madoff himself—about the prior Washington investigation. (Compl. ¶¶ 102–04.) Shortly after the interview, the examiners decided that they should contact Madoff's clients to corroborate his trading activity. (Ex. A at 219–21.) The investigators successfully obtained useful information from one relevant third party (Barclays), but they failed to follow up on it because of a mistaken belief that they could not obtain audit-trail data from Barclays's foreign affiliates. (Compl. ¶ 101.) Another staffer stated that, to his understanding, SEC had a general policy of not contacting third parties to follow up on leads. (Compl. ¶ 100.) The team also planned on requesting written responses to follow-up on their face-to-face meeting with Madoff, but ultimately failed to do so, even though they had drafted such an inquiry letter. (Compl. ¶ 108; Ex. A at 203–04.)

When the New York investigators finally suggested conducting on-site visits of Madoff's clients, the team supervisor vetoed the suggestion. (Compl. ¶¶ 97–99.) A Washington investigator had explained that he "was hesitant to make trouble for someone so 'well connected'" (Compl. ¶ 97, quoting Ex. A at 194), and the New York supervisor "expressed a fear that he (and the junior staffers) could be sued as individuals if their inquiries to third parties somehow damaged Madoff's business." (Compl. ¶ 98.) Within days of the decision not to visit Madoff's clients, the New York investigators began drafting their case-closing memorandum, and the case was closed by September 2005. (Compl. ¶ 107.) Madoff himself believed that had the investigators contacted third-party trading partners, account holders, and/or trade-clearing and -settlement agencies,

they would likely have exposed the fraud. (Ex. A at 206–07.)

Almost immediately after the New York team closed its investigation, Harry Markopolos provided the Boston office with a third version of his report on Madoff's alleged fraud, sparking off yet another investigation in Madoff's operations. (Compl. ¶¶ 110–146.) Markopolos's report summarized the many warning signs that Madoff was running a Ponzi scheme, and referred the SEC to a handful of industry insiders who could corroborate Markopolos's suspicions. (Compl. ¶¶ 111–16.) Markopolos even recommended that the SEC simply compare Madoff's purported over-the-counter options trading to the publicly-reported information regarding exchange-based options trading. (Compl. ¶ 115; *see also* Ex. C, at 6–7.) Markopolos explained that if Madoff were truly trading in options, his high-volume trades would have a visible effect in the market. (Compl. ¶ 115.).

The Boston office referred the matter to the New York office, and emphasized to the New York staff that the report deserved close attention. (Compl. ¶ 117.) The New York office, instead of staffing the matter with experts in Ponzi schemes, placed relatively inexperienced staff members on the case. (Compl. ¶ 118.) The investigators failed to treat the matter as a Ponzi scheme investigation, and generally refused to credit Markopolos's report because of interpersonal tensions (Compl. ¶¶ 119–20, 122) and a misguided belief that Markopolos was seeking a reward for uncovering the fraud. (Compl. ¶ 121.) The team also relied on the earlier New York team's incorrect assertion that it had in fact investigated the Ponzi-scheme angle, which deterred the new team from fully following up on Markopolos's suggestions. (Compl. ¶ 123.) Additionally, because the new team had failed to file a "matter un-

der inquiry" report for two months, a new tip—this time from an anonymous investor who stated that he had invested with Madoff but withdrew his money when he began suspecting fraud—was improperly ignored. (Compl. ¶¶ 124–25.) Because the team felt outmatched by the technical aspects of Madoff's operations, they forwarded certain matters to the SEC's Office of Economic Analysis, but due to miscommunications running in both directions, these efforts failed to produce useful insights. (Compl. ¶¶ 128–30.)

The unprepared New York investigations team eventually proceeded with its investigation and interviewed Madoff directly. (Compl. ¶¶ 132–36.) At one point, the interview produced potentially incriminating information—Madoff's account number with the Depository Trust Company—but the investigators failed to properly follow up on the matter. (Compl. ¶¶ 136–37.) When a junior staffer contacted the Depository Trust Company, the staffer failed to recognize the significance of the fact that Madoff held his assets in commingled accounts, and the staffer also failed to ask about the size of the account. (Compl. ¶¶ 138–39; Ex. A at 323–24.) Madoff himself has acknowledged that had the investigators simply asked to see the size of the account, they immediately would have discovered that Madoff's trading positions were nowhere near as large as he had claimed. The staff believed, based on Madoff's representations, that the Depository Trust Company account held over $2 billion of securities; in fact, the account held only between $10 and $30 million. (Ex. A at 332–33.)

The investigators also failed to recognize the significance of the fact that the National Association of Securities Dealers told them that Madoff had no option positions on a particular date, even though Madoff's purported trading strategy was based on options trades. (Compl. ¶ 140.) Finally, the investigators made, in the Report's description, an "inexplicable decision" not to send a letter to obtain information from Madoff's purported European counterparties. (Compl. ¶ 141; Ex. A at 371.) The team closed the investigation in June 2006, having overlooked various clear indications of Madoff's fraud. (Compl. ¶¶ 144–47.) The team also failed to follow up on possible charges related to Madoff's various misrepresentations and non-disclosures during the interview and examinations. (*See* Ex. A at 322–23.)

Following that investigation, the SEC received three more tips that might have uncovered the fraud. (Compl. ¶¶ 148–53.) The first was dismissed when Madoff's attorney told the SEC that the tipster was not actually a Madoff client (Compl. ¶ 150); the second was yet another Markopolos warning that was simply ignored because the staff believed that it had fully examined the Ponzi-scheme allegations (Compl. ¶ 151; Ex. A at 354–55); and the third tip (from the former Madoff investor whose earlier complaint had arrived just prior to the opening of the final investigation) was likewise ignored because the investigation was deemed complete. (Compl. ¶¶ 152–53.)

More than two years after the closure of the final investigation, Madoff's fraud was exposed. (Compl. ¶¶ 154–55.) The fraud could have been discovered at any number of points in the previous sixteen years had the SEC "performed its everyday, non-discretionary functions with the most basic level of competence." (Compl. ¶ 158.) At various points, even "a single action, performed diligently and ably, or even with the most minimal competence, would have exposed the scheme." (Compl. ¶ 159.)

## II.  PRELIMINARY  PROCEDURAL  ISSUES

### A.  THE  SECURITIES  AND  EXCHANGE  COMMISSION  IS  NOT  A  PROPER  DEFENDANT

The three Dichter Plaintiffs (that is, the Dichter–Mad investment partnership, Philip Dichter, and Claudia G. Dichter) voluntarily dismissed the SEC and the Doe Defendants on January 11, 2010.

**[3]**  The SEC brings a separate Motion to Dismiss Plaintiff Gordon's claims against it. [Docket no. 7.] In its one-page motion, the SEC cites clear controlling authority that bars Gordon's claims. *See, e.g., FDIC v. Craft*, 157 F.3d 697, 706 (9th Cir.1998) ("The FTCA is the exclusive remedy for tortious conduct by the United States, and it only allows claims against the United States. Although such claims can arise from the acts or omissions of United States agencies (28 U.S.C. § 2671), an agency itself cannot be sued under the FTCA."); *see also Standifer v. SEC*, 542 F.Supp.2d 1312, 1317 (N.D.Ga.2008) ("The SEC cannot be sued under the FTCA.")

In Gordon's Opposition,[9] he does not even attempt to argue that his claims against the SEC are viable. Accordingly, the SEC's Motion is GRANTED. Gordon's claims against the SEC are DISMISSED.

### B.  THE  DOE  DEFENDANTS  ARE  PERMISSIBLE

As for the Doe Defendants, Gordon properly points out that the Government does not necessarily have standing to object to their presence. For purposes of this motion, then, the Doe Defendants' liability is linked with that of the United States.

## III.  LEGAL  STANDARDS

### A.  MOTION  TO  DISMISS  FOR  LACK  OF  SUBJECT  MATTER  JURISDICTION

**[4]**  In order to comply with the notice pleading standards of Fed.R.Civ.P. 8(a), a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.*; *see also Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir.2009) (citing *Iqbal*, 129 S.Ct. at 1951).[10]

---

**9.**  Gordon's "Opposition" brief is 37–pages long, well above the 25–page limit set by this Court. In addition, Gordon did not file his substantive brief with this Court until March 1, which was one week later than the deadline set by this Court's Local Rules. The Court accordingly STRIKES Gordon's Opposition. However, as the document raises the same issues as are raised in Plaintiffs' joint Opposition and Sur–Reply (which the Court has considered despite its procedural irregularities), the Court has addressed all the issues raised in Gordon's stricken submission.

**10.**  Although the present motion is a motion to dismiss for lack of jurisdiction under Fed. R.

Civ. 12(b)(1) rather than a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), motions to dismiss on jurisdictional grounds are governed by the standard pleading rules of Fed.R.Civ.P. 8(a). *See Doe v. Holy See*, 557 F.3d 1066, 1074 (9th Cir.2009) (per curiam) (citing *Twombly*, 127 S.Ct. at 1964–65), *cert. filed* (June 25, 2009). In addition, it should be noted that *Twombly* and *Iqbal*, while technically brought under Fed. R. Civ. 12(b)(6), focused their analysis on the notice pleading requirements of Fed.R.Civ.P. 8(a). *Twombly* and *Iqbal* therefore state the proper standard for addressing the sufficiency of Plaintiffs' allegations with respect to the Court's subject matter jurisdiction.

Generally, the Court's analysis is limited to the contents of the complaint. *See Schneider v. Cal. Dept. Of Corrections*, 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) (citations omitted). However, "[w]hen a plaintiff has attached various exhibits to the complaint, those exhibits may be considered in determining whether dismissal [i]s proper." *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted). Likewise, the Court "may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir.2003).

When a motion to dismiss is granted, ordinarily "any dismissal[,] . . . except one for **lack of jurisdiction,** improper venue, or failure to join a party under Rule 19[,] operates as an adjudication on the merits." Fed.R.Civ.P. 41(b) (emphasis added).

### B.  FEDERAL TORT CLAIMS ACT

The Federal Tort Claims Act ("FTCA") "gives federal courts jurisdiction over claims against the United States for money damages 'for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Sheridan v. United States*, 487 U.S. 392, 398, 108 S.Ct.

In the only post-*Twombly* circuit court to address pleading standards in the FTCA context, the Fifth Circuit cited *Twombly* as the operative standard governing a jurisdictional dispute like the present one. *Castro v. United States*, 560 F.3d 381, 386 (5th Cir.2009) (citing *Lane v. Halliburton*, 529 F.3d 548, 557

2449, 101 L.Ed.2d 352 (1988) (quoting 28 U.S.C. § 1346(b)). The FTCA provides, however, that the government shall not be liable for "[a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This statutory provision, known as the "discretionary function exception," lies at the heart of the present motion. Because the FTCA is jurisdictional, it must be emphasized that the present analysis is focused on jurisdictional considerations rather than the merits of Plaintiffs' Complaint.

### C.  DISCRETIONARY  FUNCTION EXCEPTION

The discretionary function exception provides the government with immunity from suit for "[a]ny claim . . . based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "In this way, the discretionary function exception serves to insulate certain governmental decision-making from 'judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir.2008) (quoting *United States v. S.A. Empresa de Viacao*

(5th Cir.2008)). In addition, the Ninth Circuit has explicitly applied *Twombly* when analyzing a complaint under the discretionary function exception caselaw, but only had occasion to do so under the Foreign Sovereign Immunities Act, not the FTCA. *Doe v. Holy See*, 557 F.3d at 1073–74, 1084–85.

*Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)); *accord Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have discretion.").

Whether a given action by a government employee is protected by the discretionary function exception involves a two-part inquiry.

First, the court must determine whether the challenged action involves an "element of judgment or choice." *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). If "a federal statute, regulation, or policy **specifically** prescribes a course of action for the employee to follow," then the employee can be held liable for failing to follow the prescribed directive. *Id.* (emphasis added).

Second, "even assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* "Because the purpose of this exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy . . . , the exception protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323, 111 S.Ct. 1267.

**[5]** In assessing the second step, it is important to keep in mind that "if a regulation allows the employee discretion, the very existence of the regulation creates a **strong presumption** that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id.* at 324, 111 S.Ct. 1267 (emphasis added). Thus, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* In contrast, if the applicable statute or regulation does not give the employee discretion, no presumption attaches, and the court must determine whether the decisions were "of the kind" that are "susceptible to policy analysis." *Gaubert,* 499 U.S. at 323, 325, 111 S.Ct. 1267.

Where there is no statute, regulation, or policy on point (either conferring discretion or limiting discretion), the relevant question is not whether the decision was the result of an **actual** policy-based decision-making process. As the Ninth Circuit has repeatedly explained, "we do not need actual evidence that policy-weighing was undertaken." *Terbush,* 516 F.3d at 1136 n. 5 (citing *Gaubert,* 499 U.S. at 324–25, 111 S.Ct. 1267). Instead, "[t]he focus of the inquiry is . . . on the nature of the actions taken and on whether they are **susceptible** to policy analysis." *See Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267 (emphasis added); *see also GATX/Airlog Co.,* 286 F.3d at 1178 ("[T]he question is not whether policy factors necessary for a finding of immunity were **in fact** taken into consideration, but merely whether such a decision is **susceptible** to policy analysis."); *Nurse v. United States,* 226 F.3d 996, 1001 (9th Cir.2000) ("the challenged decision need not actually be grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis."); *Childers v. United States,* 40 F.3d 973, 974 n. 1 (9th Cir.1994) ("The application of the exception does not depend, however, on whether federal officials actually took public policy considerations into account. All that is required is that the applicable statute or regulation gave the government agent discretion to take policy goals into account."); *Lesoeur v. United States,* 21 F.3d 965, 969 (9th

Cir.1994) ("[Appellants] argue that the discretionary function exception cannot apply in the absence of a 'conscious decision.' The statute is not so limited.... The language is directed at the nature of the conduct, and does not require an analysis of the decision-making process.") (quoting *In re Consol. United States Atmos. Testing Litig.,* 820 F.2d 982, 988–89 (9th Cir. 1987)).

The Ninth Circuit has noted that "the distinction between protected and unprotected decisions can be difficult to apprehend, but this is the result of the nature of government actions—they fall 'along a spectrum, ranging from those totally divorced from the sphere of policy analysis, such as driving a car, to those fully grounded in regulatory policy, such as the regulation and oversight of a bank.' " *Soldano v. United States,* 453 F.3d 1140, 1145 (9th Cir.2006) (quoting *Whisnant v. United States,* 400 F.3d 1177, 1181 (9th Cir. 2005)). This distinction is drawn in part from the Supreme Court's discussion in *Gaubert,* in which the Court explained:

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Gaubert,* 499 U.S. at 325 n. 7, 111 S.Ct. 1267.

In addition to these general principles, it should also be noted that the courts have rejected "a rigid dichotomy between 'planning' and 'operational' decisions and activities." *Terbush,* 516 F.3d at 1130 (citing *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267). The courts have likewise rejected the argument that the government is *per se* immune when conducting "uniquely governmental functions," as such an analysis would "push the courts into the 'non-governmental'-'governmental' quagmire that has long plagued the law of municipal corporations." *Indian Towing Co. v. United States,* 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *see also United States v. Olson,* 546 U.S. 43, 46, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005) (reaffirming *Indian Towing* ).

## D. PROCEDURAL CONSIDERATIONS RELATING TO THE DISCRETIONARY FUNCTION EXCEPTION

[6] In deciding whether to grant Defendant's Motion to Dismiss for lack of subject matter jurisdiction, the Court "must accept as true the factual allegations in the complaint." *Terbush v. United States,* 516 F.3d 1125, 1128 (9th Cir.2008) (citing *GATX/Airlog Co. v. United States,* 286 F.3d 1168, 1173 (9th Cir.2002)). "The United States bears the burden of proving the applicability of the discretionary function exception." *Id.* (citing *Prescott v. United States,* 973 F.2d 696, 702 (9th Cir. 1992)). The government must prove that **each** of the allegedly wrongful acts, by **each** allegedly negligent actor, is covered by the discretionary function exception. *GATX/Airlog,* 286 F.3d at 1174 ("[W]hen determining whether the discretionary function exception is applicable, 'the proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance.' ") (citing *In re Glacier Bay,* 71 F.3d 1447, 1451 (9th Cir. 1995)) (alterations omitted). In examining

each of the government's particular acts, "the question of **how** the government is alleged to have been negligent is critical." *Whisnant v. United States,* 400 F.3d 1177, 1185 (9th Cir.2005) (emphasis added) (citing *Glacier Bay,* 71 F.3d at 1451). The central question is whether, "at this stage of the case"—and under the standard of proof applicable at this stage—"the government has [or has] not established that choices exercised by government officials involved policy judgments." *Prescott,* 973 F.2d at 703.

These considerations can be summarized succinctly by reference to the two-step analysis set forth in *Gaubert,* 499 U.S. at 322–25, 111 S.Ct. 1267. The government can meet its initial burden in one of two ways, and the plaintiffs can respond to each showing in one of two ways.

First, the government may show that a statute, regulation or policy confers discretion on the government actor; this gives rise to a "strong presumption" that the alleged harmful act was guided by policy judgment. *Id.* at 324, 111 S.Ct. 1267. Second, the government may show that the actor's course of action was "of the kind" that is "susceptible to policy analysis." *Id.* at 323, 325, 111 S.Ct. 1267. Either of these showings will satisfy the government's "burden of proving application of the discretionary function exception." *Blackburn v. United States,* 100 F.3d 1426, 1436 (9th Cir.1996).

"[O]nce the Government met its burden, . . . the party opposing [the application of the discretionary function exception] ha[s] to present sufficient evidence to withstand dismissal" for lack of jurisdiction. *Id.* Under *Gaubert,* the plaintiffs may meet their burden by showing either (1) that there are mandatory rules prescribing the actor's course of action, or (2) that the actor's course of action was **not** "of the kind" that is "susceptible to policy analy-

sis." *Gaubert,* 499 U.S. at 323–25, 111 S.Ct. 1267.

## E.  ILLUSTRATIVE CASELAW

As explained by a leading treatise, "cases under the [Federal Tort Claims] Act can be roughly grouped into there categories: (1) claims based upon [nonregulatory] determinations or decisions or other acts of choice or judgment of government officials and administrators; (2) claims based upon the regulatory activities of regulatory agencies or officials; and (3) claims arising from the design or execution of public works and other authorized governmental programs."  Lester S. Jayson & Robert C. Longstreth, 2 *Handling Federal Tort Claims,* § 12.05[1] (2009 update).

"Whatever else the discretionary function exception may include, . . . it plainly was intended 'to encompass the discretionary acts of the Government acting in its role as regulator of the conduct of private individuals.'"  Jayson & Longstreth, *Federal Tort Claims,* § 12.07 (quoting *United States v. Varig Airlines,* 467 U.S. 797, 813–14, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). That is not to say that regulatory actions enjoy blanket immunity: the "uniquely government functions" approach was rejected by the Supreme Court over half-a-century ago.  *See Indian Towing,* 350 U.S. at 64, 76 S.Ct. 122.  But at the very least, it appears from the caselaw and secondary authorities that regulatory actions are more likely to be deemed "discretionary functions" than non-regulatory actions are.

A leading case involving government regulators is *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).  In that case, the plaintiff alleged that the Federal Home Loan Bank Board and the Federal Home Loan Bank Dallas branch "had been negligent in carrying out their supervisory activities" following their take-over of a failing Texas savings-and-

loan. *Id.* at 318, 111 S.Ct. 1267. The plaintiff, who was the chairman and largest shareholder of the thrift, sought to recover the lost value of his shares and the value of his personal guarantee of the corporation's debts, amounting to $100 million in total. *Id.* at 319–20, 111 S.Ct. 1267. In particular, the plaintiff alleged that the Federal Home Loan Bank Dallas branch had pressured the failed thrift's sitting officers and directors to resign and then recommended their replacements. *Id.* at 319, 111 S.Ct. 1267. The Dallas branch then became significantly involved in the thrift's day-to-day operations. *Id.* at 319–20, 111 S.Ct. 1267. The plaintiff's allegations centered on the "alleged negligence of federal officials in selecting the new officers and directors and in participating in the day-to-day management of" the thrift. *Id.* at 320, 111 S.Ct. 1267.

The Supreme Court, after restating the basic two-part test for the discretionary function exception, held that "[d]ay-to-day management of banking affairs, like the management of other businesses, regularly requires judgment as to which of a range of permissible courses is the wisest." *Id.* at 325, 111 S.Ct. 1267. In this regard, the Court rejected the proposed distinction between "policymaking" and "operational" functions. *Id.* In order to determine whether the alleged acts were discretionary or not, the Court reviewed the complaint's allegations of the government's involvement in the thrift's day-to-day affairs. These allegations focused on the government's involvement in day-to-day management decisions, hiring and salary decisions, operational matters, financial matters, asset management, and legal affairs. *Id.* at 327–28, 111 S.Ct. 1267. The government became involved in strategic planning, for example by recommending that the thrift change from being state-chartered to becoming federally-chartered, and by giving advice regarding a potential bankruptcy filing. *Id.* at 328, 111 S.Ct. 1267.

Ultimately, the Court rejected the plaintiff's argument "that the challenged actions fall outside the discretionary function exception because they involved the mere application of technical skills and business expertise." *Id.* at 331, 111 S.Ct. 1267. The Court explained that the day-to-day operations of a bank require more than mere "mathematical calculations" that "involve no choice or judgment in carrying out the calculations." *Id.* Importantly, the Court also noted that "neither party has identified **formal** regulations governing the conduct in question." *Id.* at 329, 111 S.Ct. 1267 (emphasis added). The Court identified broad statutory grants of discretion to the Federal Home Loan Bank to engage in formal supervisory actions, and found no prohibition on the agency's use of less formal supervisory tools. *Id.* The Court also identified a formal policy statement from the government in which the agency explained its policy "that supervisory actions must be tailored to each case," ranging from "informal supervisory guidance and oversight," to implementation of a "supervisory agreement," and, in the most problematic cases, an immediate "cease-and-desist order." *Id.* at 330–31, 111 S.Ct. 1267 (quoting FHLBB Resolution No. 82–381 (May 26, 1982)).

Notably, the Court approvingly quoted from the lower court's explanation that the agency undertook its day-to-day role in an effort to further "social, economic, or political policies":

> First, they sought to protect the solvency of the savings and loan industry at large, and maintain the public's confidence in that industry. Second, they sought to preserve the assets of [the thrift] for the benefit of depositors and shareholders, of which [plaintiff] was one.

*Id.* at 332, 111 S.Ct. 1267 (quoting 885 F.2d 1284, 1290 (5th Cir.1989)). In this regard,

the Supreme Court highlighted the fact that "[t]here are no allegations that the regulators gave anything other than the kind of advice that was within the purview of the policies behind the statutes." *Id.* at 333, 111 S.Ct. 1267. For example, the plaintiff admitted "the regulators replaced [the thrift's] management in order to protect the [federal savings and loan insurance corporation's] insurance fund." *Id.* at 332, 111 S.Ct. 1267.

"In the end," the Court concluded, "Gaubert's amended complaint alleges nothing more than negligence on the part of the regulators." *Id.* at 334, 111 S.Ct. 1267. The Court explained that even day-to-day regulatory decisions were protected by the discretionary function exception: "If the routine or frequent nature of a decision were sufficient to remove an otherwise discretionary act from the scope of the exception, then countless policy-based decisions by regulators exercising day-to-day supervisory authority would be actionable. This is not the rule of our cases." *Id.*

*Gaubert,* then, is a guidepost for two reasons: one, because it is the most recent Supreme Court authority in this area, and two, because it involved a roughly analogous factual scenario—the conduct of financial regulators in their day-to-day regulatory activities. (Additional cases that specifically discuss the SEC are discussed *infra.*) It is worth noting, then, that *Gaubert's* reasoning weighs heavily in favor of Defendant's position.

A pair of other cases are worth discussing at length. These cases set forth principles that have guided the Ninth Circuit's analysis where cases involve a combination of discretionary and non-discretionary duties.

In *Glacier Bay,* the Ninth Circuit held that hydrographers for the National Oceanic and Atmospheric Administration could be sued for their non-discretionary actions made while preparing nautical charts. 71 F.3d at 1452–54. The government had argued that its supervising hydrographers retained discretion when reviewing and approving the charts, and that this final level of discretion immunized all of the allegedly negligent conduct during the oceanic surveys and drafting of the charts. *Id.* at 1451. The court explained that the final review was indeed discretionary, because the supervisors had to decide whether the survey was sufficiently accurate and whether the social, economic, and political benefits of conducting further surveys outweighed the costs of doing so. *Id.* at 1454. However, the court also determined that the discretionary final review could not insulate the surveying staff's negligent acts that violated the surveyors' mandatory duties. *Id.* at 1451. Instead, the court explained that the relevant question is whether "**each** person taking an allegedly negligent action had discretion," not whether "the Government as a whole had discretion at any point." *Id.*[11]

The court then engaged in a close analysis of the surveyors' actions to determine if they violated any non-discretionary duties. *Id.* at 1452–54. To find these mandatory duties, the court looked to "the Department of Commerce's 'Hydrographic Manual' and [ ] the 1964 and 1975 Project Instructions specifically drafted for the two surveys [at issue].' " *Id.* at 1452. The court noted that, contrary to the government's assertion, such internal guidelines were in fact "binding for purposes of the discretionary function inquiry." *Id.* at 1452 n. 1. The court found that the Hydro-

---

**11.** The court also noted, however, that the presence of a discretionary final review might affect the merits of the claim because the plaintiff would be unable to show that the

negligent acts proximately caused the plaintiff's harm. *Id.* (citing *Routh v. United States,* 941 F.2d 853, 855 (9th Cir.1991).)

graphic Manual and Project Instructions established a number of mandatory procedures for conducting oceanic surveys. *Id.* at 1451–52. Much of the "discretion" available to the surveyors involved purely scientific judgments, not judgments based on "economic, political and social policy" that would be shielded from scrutiny under the FTCA. *Id.* at 1453. Notably, the court contrasted the 1964 survey instructions with the 1975 survey instructions and found that the former contained mandatory language—"[a]ll indications of shoals **shall** be thoroughly investigated"—whereas the latter did not contain such language, and instead stated that surveys "should be guided by [27 different] considerations . . . and [the surveyor's] past experience in similar areas." *Id.* at 1453 (quoting Hydrographic Manual and 1964 Survey Instructions). Accordingly, the earlier 1964 survey was deemed non-discretionary, whereas the 1975 survey—requiring surveyors to carefully balance 27 different considerations—was discretionary. *Id.*

Three years later, the Ninth Circuit clarified its holding in *Glacier Bay,* explaining that in some instances, an underlying violation of a mandatory duty will be immune from suit if another government agent's own exercise of discretion intervened prior to the plaintiff's injury. The court explained that the discretionary function exception applies whenever a "robust exercise of discretion intervenes between an alleged government wrongdoer and the harm suffered by a plaintiff." *General Dynamics Corp. v. United States,* 139 F.3d 1280, 1285 (9th Cir.1998). The court proceeded to distinguish the case at hand from *Glacier Bay.* The plaintiff in *General Dynamics* alleged that government auditors had negligently performed an audit that led prosecutors to indict the plaintiff for defrauding the United States, a charge which the plaintiff successfully defended. *Id.* at 1282. The court held that the plaintiff, by attempting to recover

for the auditors' professional negligence rather than the prosecutors' clearly discretionary decision to prosecute, was improperly attempting to plead around the discretionary function exception. *Id.* at 1283–84. The court refused to "accord amaranthine obeisance to a plaintiff's designation of targeted employees" when, in sum and substance, the complaint was alleging prosecutorial misconduct. *Id.* at 1283.

The *General Dynamics* court distinguished *Glacier Bay* by emphasizing that the central focus is the **nature** of the allegedly **harmful act.** *Id.* at 1284–85. Obviously, "many actions within an agency pass through the hands of somebody with some discretion at some stage"; the mere presence of discretion at one stage in the process does not automatically immunize the non-discretionary negligent conduct that precedes. *Id.* at 1284. Accordingly, when an oceanic chart is negligently investigated and drafted in violation of mandatory rules, the presence of a discretionary final review does not immunize the negligent investigations and drafting. *Id.* In this regard, the court noted that *Glacier Bay* involved a "tight coupling between hydrographers, reviewers, charts, and results." *Id.* at 1284.

But when an actor with "broad based discretion" such as the prosecutor in *General Dynamics* undertakes "a totally separate exercise of discretion" that is independent of the underlying negligent act, all of the government's acts are immunized—including the earlier actions that may have violated mandatory duties. *Id.* at 1285. The court explained that prosecutors have "access to a great deal of information beyond that submitted by any one agency" such as the negligent auditors. Because "the prosecutors could have had even more information if they had chosen to pursue it," the prosecutor's decision to prosecute the plaintiff was a sufficiently "robust ex-

ercise of discretion" to trigger application of the discretionary function exception. *Id.* As a result, all of government's negligent acts were immunized—even the ones that violated non-discretionary auditing principles.

Although they are factually distinguishable from the present case, two out-of-circuit decisions are also worth noting in order to show that the reasoning in *General Dynamics* has been adopted in other circuits.[12] In *Sloan v. United States Dept. of Housing and Urban Development*, 236 F.3d 756 (D.C.Cir.2001), a contractor sued the Department of Housing and Urban Development under the FTCA for negligently conducting an audit of his construction site and for suspending him from government contract work based on the erroneous audit. 236 F.3d at 758–59. On appeal from the district court's dismissal of the complaint for lack of subject matter jurisdiction, the contractor contended that while the suspension of his government contract work was a discretionary function, the audit was not a discretionary function because it was governed by standards of professional practice. *Id.* at 761. The court rejected that contention, holding that there was "no meaningful way in which the allegedly negligent investigatory acts could be considered apart from the totality of the prosecution." *Id.* (quoting *Gray v. Bell*, 712 F.2d 490, 516 (D.C.Cir.1983)) (internal quotation marks omitted). The court noted that "[t]he complaint does not allege any damages arising from the investigation itself, but only harm caused by the suspension to which it assertedly led." *Id.* at 762.

In *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279 (3d Cir.1995) (en banc), Chilean fruit growers sued the Food and Drug Administration under the FTCA for banning the importation of Chilean fruit based on a negligently conducted laboratory test concluding that the fruit contained cyanide. 46 F.3d at 282–83. Recognizing that the Commissioner's decision to ban the fruit was a discretionary function, the fruit growers alleged injury "based upon" the negligence of the laboratory technicians, who were bound by the agency's Regulatory Procedures Manual. *Id.* at 286. The Third Circuit rejected this characterization of the claim, reasoning that "[t]he reality here is that the injuries of which the plaintiffs complain were caused by the Commissioner's decisions and, as a matter of law, their claims are therefore 'based upon' those decisions." *Id.* The court concluded that "a claim must be 'based upon' the exercise of a discretionary function whenever the immediate cause of the plaintiff's injury is a decision which is susceptible of policy analysis and which is made by an official legally authorized to make it." *Id.* at 282.

## F. UNDERLYING POLICIES OF THE DISCRETIONARY FUNCTION EXCEPTION

Before analyzing the parties' specific arguments, it is also helpful to explain the policies that animate the discretionary function exception. As summarized succinctly in *Gray v. Bell*, 712 F.2d 490 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984):

The modern policy basis justifying sovereign immunity from suit has three principal themes. First, and most important, under traditional principles of **separation of powers,** courts should refrain from reviewing or judging the propriety of the policymaking acts of coordinate branches. Second, consistent with the related doctrine of official im-

---

**12.** The summaries of these cases are drawn from *Jerome Stevens Pharma., Inc. v. Food &* *Drug Admin.,* 402 F.3d 1249, 1254–55 (D.C.Cir.2005).

munity, courts should not subject the sovereign to liability where doing so would inhibit **vigorous decisionmaking by government policymakers.** Third, in the interest of **preserving public revenues and property,** courts should be wary of creating huge and unpredictable governmental liabilities by exposing the sovereign to damage claims for broad policy decisions that necessarily impact large numbers of people. Framed in different fashions, each of these themes appears again and again, alone or in combination, as a modern justification for retaining a form of immunity, under the general rationale that courts should not "interfere" with government operations and policymaking.

*Id.* at 511 (emphasis added, internal footnotes omitted).

Notably absent from this rationale is any mention of "fairness." As explained in *National Un. Fire Ins. v. United States,* 115 F.3d 1415 (9th Cir.1997):

> Private actors generally must pay for the harm they do by carelessness. The government's power to tax enables it, better than any private actor, to perform its conduct with reasonable care for the safety of persons and property, and to spread the cost over all the beneficiaries if its conduct negligently causes harm. Fairness might seem to suggest that the government should be liable more broadly than private actors. But at its root, the discretionary function exception is about power, not fairness.

*Id.* at 1422.

As a result of these underlying policies and principles, Plaintiffs are misguided when they argue that "there is no oversight at all available to the taxpaying citizens, as well as the nation, to insure that the SEC does its job." (Opp. at 15.) This broad policy argument is unavailing.

## IV. ANALYSIS AND DISCUSSION

### A. RELEVANT LEGISLATIVE HISTORY

It is often remarked that Congressional intent is particularly relevant to the Federal Tort Claims Act because "no action lies against the United States unless the legislature has authorized it." *E.g., Dalehite v. United States,* 346 U.S. 15, 30, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (collecting cases). As a result, "the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that **Congress intended** to shield from tort liability." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813–814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (emphasis added).

It is notable, then, that Congress, when drafting and debating the Federal Tort Claims Act, repeatedly and explicitly suggested that the discretionary function exception was intended to apply to the SEC. *See Dalehite v. United States,* 346 U.S. 15, 29 & n. 21, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (noting that this particular "paragraph [ ] appears time and again" in the legislative history). Congress explained that the discretionary function exception was:

> designed to preclude application of the bill to a claim against a regulatory agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved. To take another example, claims based upon an allegedly negligent exercise by the Treasury Department of the blacklisting or freezing powers are also intended to be excepted. The bill is not

intended to authorize a suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion.

*Dalehite,* 346 U.S. at 29 n. 21, 73 S.Ct. 956 (quoting H.R.Rep. No. 2245, 77th Cong., 2d Sess., p. 10; S.Rep.No. 1196, 77th Cong., 2d Sess., p. 7; H.R.Rep. No. 1287, 79th Cong., 1st Sess., pp. 5–6; Hearings before H.Com. on Judiciary on H.R. 5373 and H.R. 6463, 77th Cong., 2d Sess., p. 33); *see also* Defs.' Mot. at 10 & n. 29 (quoting House Rep. 79–1287, at 5–6).

## B. THE GOVERNMENT HAS SATISFIED ITS THRESHOLD BURDEN BY IDENTIFYING STATUTES, REGULATIONS, AND CASES DISCUSSING THE SEC'S GENERAL POWERS AND DUTIES

[7]   In its Motion, the Government sets forth a number of general, broad principles governing the SEC's duties and functions. These legal assertions establish that the alleged wrongs were done in the course of the SEC's exercise of its discretion, both in terms of conducting its investigations and deciding whether or not to bring enforcement proceedings. These basic conclusions are supported by statutes, regulations, and caselaw. Defendant has therefore satisfied its threshold burden under *Gaubert* of establishing that the relevant statutes and regulations "allow[ ] the employee[s] discretion." *Gaubert,* 499 U.S. at 323, 111 S.Ct. 1267. Accordingly, there is "a **strong presumption**" that the alleged acts were "based on considerations of public policy," and Plaintiffs bear the burden of rebutting this presumption. *Id.*

This section discusses the Government's threshold showing that its actions were discretionary and are presumed to be susceptible to policy analysis. The following section discusses Plaintiffs' attempt to rebut this strong presumption.

### 1. SEC's Investigative Powers

Section 21 of the Securities and Exchange Act of 1934, codified at 15 U.S.C. § 78u, establishes the SEC's investigatory powers. The statute explicitly provides discretion to the SEC:

> The Commission **may, in its discretion,** make such investigations **as it deems necessary** to determine whether any person has violated, is violating, or is about to violate any provision of this chapter, [or] the rules or regulations thereunder, . . . **and may** require or permit any person to file with it a statement in writing, under oath or otherwise as the Commission shall determine, as to all the facts and circumstances concerning the matter to be investigated. The Commission is authorized **in its discretion,** . . . to investigate any facts, conditions, practices, or matters which **it may deem** necessary or proper to aid in the enforcement of such provisions . . . .

15 U.S.C. § 78u(a)(1) (emphasis added).

Little discussion is necessary. The statute repeatedly uses permissive language rather than mandatory language. The SEC has discretion to decide both the **timing** of when it "make[s] such investigations," and the **manner and scope** of how to "investigate any facts, conditions, practices, or matters," whether through "a statement in writing, under oath **or otherwise.**" *Id.* (emphasis added). All of these decisions are framed in permissive language ("[t]he Commission **may** . . .") and the SEC is permitted to proceed "as it deems necessary." *Id.* In other words, the statute is discretionary—the SEC retains discretion over **when** and **how** to conduct its investigations. This leads to a strong presumption that the SEC's actions were discretionary. *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267; *see also Vickers v. United States,* 228 F.3d 944, 951 (9th Cir.2000) ("[T]he discretionary function exception

protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive.").

The SEC's own regulations are similarly discretionary. As explained in the SEC's formal policies regarding Enforcement Activities, as summarized in 17 C.F.R. § 202.5:

> Where, from complaints received from members of the public, communications from Federal or State agencies, examination of filings made with the Commission, or otherwise, it appears that there may be violation of the acts administered by the Commission or the rules or regulations thereunder, a **preliminary investigation** is **generally** made. In such preliminary investigation no process is issued or testimony compelled. The Commission **may, in its discretion,** make such formal investigations and authorize the use of process **as it deems necessary** to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or the rules of a self-regulatory organization of which the person is a member or participant....

17 C.F.R. § 202.5(a) (emphasis added). This regulation does not **require** the SEC to conduct its investigations in any particular manner; rather, the agency retains broad discretion to decide how to conduct its investigations.

In light of this statutory and regulatory language, the courts have unanimously rejected challenges to the SEC's use of its investigatory powers. In a pre-FTCA case, Justice Vinson, then a member of the District of Columbia Court of Appeals, wrote an opinion that, inter alia, granted official immunity to members of the SEC for their investigatory activities. *Jones v. Kennedy,* 121 F.2d 40, 43–44 (D.C.Cir. 1941). In a terse discussion, the court explained:

> the **carrying out of investigations** and the turning over of evidence to the Attorney General for presentation to a grand jury come under the authorized duties of the Commission. And likewise, plaintiff has not met, in these allegations, the task of showing acts which fall outside of the [SEC's] immunity.

*Id.* at 43–44 (internal footnote omitted) (emphasis added) (citing 15 U.S.C. §§ 77h(e), 77s(c), 77t(b)).

Numerous subsequent courts have held that the SEC is immune from liability for its investigative actions. In *Schmidt v. United States,* 198 F.2d 32 (7th Cir.1952), the court applied the discretionary function exception to bar a claim that the SEC was investigating a corporation and publicizing its investigation for the improper purpose of destroying the company. *Id.* at 33, 36. The court explained that the SEC's decision to institute an investigation and conduct it in a particular manner "was ... clearly within the scope of its discretionary authority" under the 1934 Exchange Act. *Id.* at 36. Nothing more was said, and nothing more needed to be said. The point was—and remains to this day— "perfectly clear [ ] under the terms of the applicable statutes." *Id.*

The same point has been stated in subsequent cases including *Sprecher v. Von Stein,* 772 F.2d 16, 18 (2d Cir.1985), and other cases discussed *infra,* subsection 3.

### 2. SEC's Enforcement Powers

The SEC likewise has discretion regarding the use of its enforcement powers. Under 15 U.S.C. § 78u(d)(1), the SEC has discretion over decisions to seek an injunction against ongoing violations of the Exchange Act:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter [or] the rules or regula-

tions thereunder, ... it **may in its discretion bring an action** in the proper district court of the United States ... to enjoin such acts or practices....

15 U.S.C. § 78u(d)(1) (emphasis added).

The SEC retains similar discretion regarding whether to seek monetary relief or other injunctive relief. See § 78u(d)(3) ("the Commission **may** bring an action in a United States district court to seek ... a civil penalty to be paid by the person who committed such violation.") (emphasis added); § 78u(d)(5) ("the Commission **may** seek ... any equitable relief that **may be appropriate or necessary** for the benefit of investors.") (emphasis added).

The regulations are similarly discretionary. Again under 17 C.F.R. § 202.5:

After investigation or otherwise **the Commission may in its discretion** take one or more of the following actions: Institution of administrative proceedings looking to the imposition of remedial sanctions, initiation of injunctive proceedings in the courts, and, in the case of a willful violation, reference of the matter to the Department of Justice for criminal prosecution. The Commission **may also, on some occasions,** refer the matter to, or grant requests for access to its files made by, domestic and foreign governmental authorities or foreign securities authorities, self-regulatory organizations such as stock exchanges or the National Association of Securities Dealers, Inc., and other persons or entities.

17 C.F.R. § 202.5 (emphasis added).

Again, the courts are unanimous in holding that these statutory powers are discretionary. In *SEC v. Research Automation Corp.,* 521 F.2d 585, 590 (2d Cir.1975), the court summarily dismissed a defendant's FTCA-based counterclaim because the SEC had discretion "to institute and maintain the present [enforcement] action."

The same conclusion was reached in *S.E.C. v. Better Life Club of America, Inc.,* 995 F.Supp. 167, 180 (D.D.C.1998), *aff'd,* 203 F.3d 54 (D.C.Cir.1999), *cert. denied sub nom. Taylor v. S.E.C.,* 528 U.S. 867, 120 S.Ct. 165, 145 L.Ed.2d 140 (1999). In that case, a defendant in an SEC enforcement action brought counterclaims for tortious interference with contract and intentional infliction of emotional distress on account of its enforcement actions. The court dismissed these counterclaims under the discretionary function exception because "[i]nvestigation and prosecution under § 21 of the Securities Acts is discretionary; therefore the United States is immune to these claims." *Id.* at 180 (citing *Board of Trade of City of Chicago v. SEC,* 883 F.2d 525, 531 (7th Cir.1989)).

### 3. The Unanimous Precedent is Supported by the Justifications of the Discretionary Function Exception

The *Better Life Club* court relied on an Administrative Procedures Act case decided by the Seventh Circuit, *Board of Trade v. SEC,* 883 F.2d 525, 531 (7th Cir.1989). In *Board of Trade,* the court refused to exercise jurisdiction over two futures exchanges' claims that SEC had abused its discretion by issuing a no-action order and refraining from prosecuting a competing non-exchange "system" that acted as a clearing agency for options trades. The court explained that the "[r]efusal to prosecute is a classic illustration of a decision committed to agency discretion," and under the Securities Exchange Act, "[i]nvestigation and prosecution under § 21 are discretionary, not mandatory." 883 F.2d at 530–31. Judge Easterbrook explained at length the reasons why these decisions are discretionary and involve policy judgment:

Doing nothing may be the most constructive use of the Commission's resources. Congress gives the SEC a

budget, setting a cap on its personnel. With limited numbers of staff-years, the Commission must enforce several complex statutes. To do this intelligently the Commissioners must assign priorities. Prosecuting the System means less time for something else—investigating claims of fraud in issuing new stock or conducting a takeover contest, resolving disputes under the Investment Company Act, and so on. Agencies may find it worthwhile to give short shrift to a particular claim if the aggrieved party can file its own suit (as the [plaintiff] futures markets may), for turning the subject over to private litigation frees up time without necessarily diminishing the enforcement of the statute. Yet even when the aggrieved party cannot vindicate its own rights, as with the National Labor Relations Act—indeed, even when the person complaining about failure to prosecute is a defendant whose business is going down the tubes—decisions about the best use of the staff's time are for the prosecutor's judgment.

Courts cannot intelligently supervise the Commission's allocation of its staff's time, because although judges see clearly the claim the Commission has declined to redress, they do not see at all the tasks the staff may accomplish with the time released. Agencies must compare the value of pursuing one case against the value of pursuing another; declining a particular case hardly means that the SEC's lawyers and economists will go twiddle their thumbs; case-versus-case is the daily tradeoff. Judges compare the case at hand against a rule of law or an abstract standard of diligence and do not see the opportunity costs of reallocations within the agency. That fundamental difference in the perspectives of the two bodies is why agencies (and other prosecutors) rather than courts must make the decisions on pursuing or dropping claims. Resource allocation is not a task governed by "law". It is governed by budgets and opportunities. Agencies "take Care that the Laws be faithfully executed" (Art. II, § 3) by doing the best they can with the resources Congress allows them. Judges could make allocative decisions only by taking over the job of planning the agency's entire agenda, something neither authorized by statute nor part of their constitutional role.

*Id.* at 531 (internal citations omitted).

Thus, even if the plain language of the Securities Exchange Act were insufficient to bar Plaintiffs' claims, Judge Easterbrook's policy analysis explains the various reasons that the discretionary function exception applies to the SEC's actions in the present case. Little more needs to be said, except that numerous other court decisions support this conclusion.

A large number of courts have held that SEC decisions are unreviewable under the FTCA and/or the Administrative Procedures Act. *See, e.g., Block v. SEC,* 50 F.3d 1078, 1084 (D.C.Cir.1995) (rejecting an Administrative Procedures Act action seeking to compel SEC action, because "[s]o far, it appears, the Commission has found [its chosen means] sufficient to induce compliance with the law. That the petitioners prefer a different means of enforcement is irrelevant. . . . [T]he agency alone, and neither a private party nor a court, is charged with the allocation of enforcement resources."); *Sprecher v. Von Stein,* 772 F.2d 16, 18 (2d Cir.1985) (claims arising out of agency's investigative operations are barred by FTCA immunity); *Sprecher v. Graber,* 716 F.2d 968, 975 (2d Cir.1983) (claims arising out of agency's investigative operations are barred by common law immunity); *Treats Intern. Ents., Inc. v. S.E.C.,* 828 F.Supp. 16, 18–19 (S.D.N.Y. 1993) (SEC's investigative decisions are unreviewable under Administrative Procedures Act); *Standifer v. SEC,* 542

F.Supp.2d 1312, 1318 (N.D.Ga.2008) (dismissing FTCA claims against SEC for numerous reasons, including the fact that "[t]he SEC is granted broad discretion by Congress to investigate possible violations of the securities laws and to determine whether to bring civil or criminal actions to remedy those violations."); *Leytman v. New York Stock Exchange,* No. 95 CV 902, 1995 WL 761843, at *3 (E.D.N.Y. Dec. 6, 1995) ("Plaintiff [ ] seeks damages from the Commission for its failure to investigate his claims about the [New York Stock] Exchange's alleged misconduct.... The Securities Exchange Act of 1934 provides that stock exchange records are subject to investigation by the [Securities and Exchange] Commission 'as the Commission ... deems necessary or appropriate.' 15 U.S.C. 78q(b). The decision of whether or not to investigate a stock exchange is left in the discretion of the Commission. [Under the FTCA,] [e]ven if the Commission abuses that discretion, the court may not intervene."); *see also* Thomas Lee Hazen, 6 *The Law of Securities Regulation,* § 16.2, at 213 n. 313 (6th ed. 2010 supp.) (collecting cases involving SEC and non-governmental regulatory bodies).

In addition, courts have repeatedly held in other contexts that the conduct of regulatory investigations are immune from FTCA liability unless there are mandatory directives that limit the investigators' discretion to determine both the **scope** and the **manner** of the investigation. *See, e.g., Alfrey v. United States,* 276 F.3d 557, 565–66 (9th Cir.2002) (prison guards had discretion to determine how thoroughly to search prisoners' cells); *Sloan v. U.S. Dept. of Housing and Urban Devel.,* 236 F.3d 756, 762 (D.C.Cir.2001) ("[T]he sifting of evidence, the weighing of its significance, and the myriad other decisions made during investigations plainly involve elements of judgment and choice."); *Vickers v. United States,* 228 F.3d 944, 951 (9th Cir.2000) (stating that "the discretionary

function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive."); *Gen. Dynamics Corp. v. United States,* 139 F.3d 1280, 1283–1284 (9th Cir.1998) (government was immune under the discretionary function exception where its auditors' allegedly negligent investigations provided the factual basis for the prosecutor's discretionary decision to prosecute); *Sabow v. United States,* 93 F.3d 1445, 1452 (9th Cir.1996) (government was immune under the discretionary function exception for its investigators' allegedly tortious investigation where "the guidelines promulgated by the [agency] in its investigative manual were meant to be followed at the discretion of [the agency's] investigating officers in light of the specific circumstances surrounding a particular investigation."); *Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279, 282 (3d Cir.1995) (en banc) (government was immune under the discretionary function exception where laboratory technicians' allegedly negligent investigations done pursuant to mandatory guidelines provided the factual basis for the Food and Drug Administration to seize allegedly tainted fruit).

The weight and logic of this caselaw leads directly to the conclusions proposed by the Government: the decisions of **whether** and **how** to conduct investigations and enforcement actions are firmly lodged in the SEC's discretion.

### 4. Procedural Effect of SEC's Statutory and Regulatory Discretionary

As explained in *Gaubert,* "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." 499 U.S. at 324, 111 S.Ct. 1267. Because the

Government has satisfied this threshold burden the burden shifts to Plaintiffs to identify particular acts and decisions that were either (1) mandatorily prescribed by statute, regulation, or policy, or (2) were not "susceptible to policy analysis." *Id.* at 323, 325, 111 S.Ct. 1267.

### C. PLAINTIFFS' BROAD ALLEGATIONS OF MISCONDUCT ARE UNAVAILING

At various points in their Complaint and moving papers, Plaintiffs assert that the SEC violated various unidentified "[p]olicies and practices," and "common-sense." (*E.g.,* Compl. ¶ 12 (alleging that the SEC staff "fail[ed] to follow the SEC's clear policies and practices")).[13]

To the extent that Plaintiffs rely on conclusory allegations about "policies," "practices," and "common-sense," they have failed to rebut Defendant's threshold showing. Broad allegations regarding undefined "policies and practices" are insufficient under clear Ninth Circuit precedent. In the recent decision in *Doe v. Holy See*, 557 F.3d at 1084–85, the Ninth Circuit examined the adequacy of a plaintiff's pleadings under the discretionary function exception as articulated by the Supreme Court in *Gaubert*.[14] The court held that the complaint failed to adequately allege the existence of non-discretionary duties imposed on the government's officials because it only "refer[red] vaguely . . . to the [defendant's] 'policies, practices, and procedures.'" *Id.* at 1084 (quoting complaint). The court explained that "no-

where does [plaintiff] allege the existence of a policy that is '**specific** and **mandatory**' on the [defendant]. He does not state the terms of this alleged policy, or describe any documents, promulgations, or orders embodying it." *Id.* (quoting *Kennewick Irrig. Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir.1989)). In addition, the alleged harmful acts were plainly susceptible to policy judgment, and under Circuit precedent, were "the type of discretionary judgments that the [discretion function exception] was designed to protect." *Id.* Because of these glaring inadequacies, the court held that the discretionary function exception applied.

Like the plaintiff in *Doe v. Holy See*, Plaintiffs in this case largely fail to identify any mandatory "policies" or "practices" that were violated in this case. (*Cf. infra* Part IV.C.) Plaintiffs' "labels and conclusions" are insufficient to satisfy the pleading requirements of Fed.R.Civ.P. 8(a)(2). *See Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. 544, 127 S.Ct. 1955).

Likewise, Plaintiffs have wholly failed to identify any of the SEC's actions that were not "**susceptible** to policy analysis." *See Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267 (emphasis added). Their Complaint and their moving papers do not contain any attempt to rebut the Government's preliminary showing that the SEC retained discretion to decide when to investigate, how to investigate, and whether or not to take enforcement actions. Plaintiffs attempt to recharacterize the nature of Defendant's burden, and argue that the Government

---

**13.** Plaintiffs explain that " 'policies' refer[s] to formal or informal policies, rules, standards, guidelines, procedures, codes, routines or other directives implemented by the SEC to govern the conduct of its agents." (Compl. ¶ 4 n. 4.) " 'Practices' refers to common-sense standards of conduct required of SEC agents in the course of exercising their duties with reasonable due care, regardless of whether the

SEC had promulgated any formal or informal policies with respect to that conduct." (*Id.*)

Under *Gaubert*, Plaintiffs' "practices" are clearly an inadequate basis for showing a **mandatory** SEC duty.

**14.** Technically, *Doe v. Holy See* involves the Foreign Sovereign Immunities Act rather than the FTCA, but, as noted *supra*, the court solely examined FTCA caselaw.

bears the burden of showing that the SEC's actions were susceptible to policy analysis. Plaintiffs are misguided. The Government has in fact satisfied its burden: it has identified specific and discretionary statutes, regulations, and caselaw-based policy arguments. *See Doe v. Holy See*, 557 F.3d at 1084–85 (where defendant identifies statutes, regulations, and case-law conferring policy-based discretion on actor, burden shifts to plaintiff to identify allegations to rebut this showing). Plaintiffs have failed to rebut Defendant's showing.

In light of the Government's showing that the SEC retains broad discretion to regulate securities markets through formal and informal means (*see supra* Part III.A), the Government has sufficiently satisfied its threshold burden of showing that the relevant investigative and enforcement decisions were discretionary and/or susceptible to policy judgments. Under *Gaubert*, this threshold showing creates a "strong presumption" that the discretionary function exception is satisfied. *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267. Plaintiffs' conclusory allegations regarding "policies and practices" fail to rebut this presumption. *See Doe v. Holy See*, 557 F.3d at 1084–85.

## D. PLAINTIFFS' ARGUMENTS ABOUT MANDATORY POLICIES ARE UNAVAILING

In an oversized sur-reply,[15] Plaintiffs attempt to satisfy their burden of rebuttal by identifying five purportedly **mandatory** duties imposed on the SEC and its staff.

---

**15.** The Court never granted Plaintiffs leave to file a sur-reply. Nor did the Court grant Plaintiffs leave to file an oversized brief. In addition, the sur-reply goes far beyond the scope of the arguments raised in the Government's Reply. Even if the Court had granted Plaintiffs leave to file an oversized sur-reply, Plaintiffs would only have been allowed to address Defendant's specific arguments in the

These are: sharing information; obtaining trading records and other information from third parties; hiring, training, and/or deploying qualified staff members; avoiding improper personal motivations; and engaging in various administrative case-management tasks.

As Plaintiffs themselves point out in their sur-reply, "it is important to specifically identify the allegations of the Complaint relating to the SEC's violation of mandatory policies." (Surreply at 5.) Yet Plaintiffs' factual allegations (which purport to incorporate the Report in its entirety) fail to support these conclusions. Plaintiffs almost wholly fail to allege that SEC's agents violated any **mandatory** duties, and where Plaintiffs' allegations provide an inference that such mandatory duties existed, Plaintiffs' arguments are defeated by the holding in *General Dynamics*, 139 F.3d at 1284–85. Plaintiffs therefore have failed to overcome the presumption that the SEC's investigative and enforcement decisions were discretionary. Accordingly, Plaintiffs' Complaint must be dismissed for lack of subject matter jurisdiction.

### 1. Duty to Share Information

Plaintiffs' Complaint alleges that SEC teams failed to coordinate their investigations among themselves and with the National Association of Securities Dealers and Chicago Board of Options Exchange. (Surreply at 6, citing Compl. ¶¶ 37, 62, 63, 78, 86, 103, 105, 123, 128, 130, 131.) According to Plaintiffs, these "negligent failures to communicate . . . were prohibited by law." (*Id.*)

---

Reply. Plaintiffs' sur-reply is therefore procedurally improper.

It is therefore well within the Court's discretion to strike the surreply. However, while the Court would ordinarily strike such an improper filing, the Court will consider the merits of Plaintiffs' arguments in order to foreclose certain of these claims in future proceedings.

Plaintiffs have failed to support their assertions. Plaintiffs' conclusory allegations fail to establish that SEC examiners were guided by any mandatory duties requiring them to share information and coordinate their activities.

Plaintiffs argue that Section 17 of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78q, imposes mandatory duties requiring SEC staff to share information. The statute reads:

> The Commission and the examining authorities [16] **shall** share such information [regarding securities exchanges and their members, brokers and dealers, ratings organizations, and clearing agencies], including reports of examinations, customer complaint information, and other nonpublic regulatory information, **as appropriate** to foster a coordinated approach to regulatory oversight of brokers and dealers that are subject to examination by more than one examining authority.

15 U.S.C. § 78q(k)(2) (emphasis added).

The statute clearly provides for SEC discretion. The mandatory "shall" is modified by the discretionary "as appropriate." *See Sabow*, 93 F.3d at 1452 (distinguishing between "suggestive ('should') [and] mandatory ('must') terms") (collecting cases). The statute itself describes the nature of "appropriate" information-sharing: the information-sharing must be "appropriate **to foster a coordinated approach to regulatory oversight.**" 15 U.S.C. § 78q(k)(2) (emphasis added). When the SEC is tasked with making decisions to "foster a coordinated approach to regulatory oversight," these decisions are inherently "grounded in social, economic, and political policy." *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267. Accordingly, the discretionary function exception applies to information-sharing under § 78q(k)(2).

The legislative history supports this conclusion. This particular subsection (formerly labeled subsection (i)) was added to the statute in 1996 by the National Securities Markets Improvement Act of 1996, Pub.L. 104–290, § 108. It is instructive to contrast the statute's final language with the language of the original House bill. The House's bill included a complex set of reporting and coordination requirements for self-regulatory organizations. *See* H.R. Rep. 104–622, 104th Cong., 2d Sess., 1996 U.S.C.C.A.N. 3877, 3877 (1996). The original bill required, inter alia: annual meetings between the SEC and self-regulatory organizations, § 108(a)(i)(2), periodic standardized reporting requirements for the SEC and self-regulatory organizations, § 108(a)(i)(3), annual evaluations by an SEC-created panel, § 108(a)(i)(7), and annual reports to Congress, § 108(a)(i)(8). *Id.* These requirements were mandatory, not discretionary: the SEC and the self-regulatory organizations had no flexibility in implementing these clear congressional directives.

However, after some legislative wrangling, *see* H.R. Conf. Rep. 104–864, 1996 U.S.C.C.A.N. 3920, 3920 (1996), the House–Senate conference committee stripped all of the above-mentioned requirements and left intact only a few generalized requirements.[17] The central pur-

---

**16.** ''For purposes of this subsection, the term 'examining authority' means a self-regulatory organization registered with the Commission under this chapter (other than a registered clearing agency) with the authority to examine, inspect, and otherwise oversee the activities of a registered broker or dealer.'' 15 U.S.C. § 78q(k)(5).

**17.** As part of the compromise, the revised law required that the SEC coordinate its activities with the self-regulatory organizations (whereas the old bill merely required the self-regulatory organizations to coordinate their activities). *Compare* 15 U.S.C. § 78q(k)(2) (''The Commission and the examining authorities shall share . . .'') *with* H.R. 3005,

pose of the final bill, as explained by the conference committee, was to streamline regulation between federal and state authorities. *id.* at 3920–21. The purpose of the remaining portions of the bill—apparently including § 108—was "to eliminate duplication, promote efficiency and protect investors." *Id.* at 3921. This broad language sets forth three general policy goals, the balancing of which requires the SEC to make inherently discretionary judgments. *See also* Milton R. Schroeder, *The Law of Regulation of Financial Institutions*, ¶ 8.06[1] (2009 update) ("The Act . . . calls for information sharing between authorities and the elimination of unnecessary and burdensome duplication in the examination process."); Rutherford B. Campbell, Jr., *Blue Sky Laws and the Recent Congressional Preemption Failure*, 22 *J. Corp. L.* 175, 204 n. 156 (1997) ("The Act . . . mandates that federal authorities attempt to eliminate duplication and enhance coordination and cooperation with the states as concerns the regulation of brokers.").

In short, the law cited by Plaintiffs is purely discretionary. Under the well-established requirements of the discretionary function exception, this Court cannot second-guess the SEC's failure to simultaneously accomplish all three of these competing policy goals set out by Congress. The goals require policy judgment and resource allocation, and are therefore subject to the discretionary function exception.

### a. Plaintiffs' factual allegations

In addition to these clear statutory rules, Plaintiffs' Complaint expressly alleges that formal policies **did not** exist. The Report (which is incorporated into the Complaint by reference) quotes one staff member as stating that "there was no rule or policy about . . . information-sharing at [the investigative] level between offices."

(Report at 133, 198, quoting testimony of Eric Swanson.) Taking this allegation as true, Plaintiffs' Complaint directly contradicts the conclusory assertions in their surreply.

### b. Summary re: duty to share information

Plaintiffs have therefore failed to meet their burden of identifying either a mandatory duty requiring the SEC to share information with other regulators, or plausible allegations that the SEC's decisions regarding information-sharing were not susceptible to policy analysis. The SEC retained discretion to determine the manner and scope of its investigations. *See Vickers*, 228 F.3d at 951 ("[T]he discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive.").

### 2. Failing to Request Materials from Third Parties

Plaintiffs argue that the SEC violated "formal SEC policies" and "basic auditing principles" by "repeatedly fail[ing] to request materials from third parties to substantiate Madoff's claimed trading activity." (Surreply at 8, citing Compl. ¶¶ 34–36, 67, 74, 77, 101, 143.) Again, Plaintiffs fail to identify any of the "formal SEC policies" upon which they rely. But Plaintiffs insist that "SEC staffers themselves considered it mandatory [to determine if Madoff was actually making the trades he purported to be making], given one staffer's characterization of the failure to do so as 'asinine.'" (Surreply at 10, quoting Compl. ¶ 77.)

Plaintiffs' arguments are not supported by their allegations. It is unclear why an SEC staff member's use of the word "asinine" provides evidence of an SEC policy.

---

§ 108(a)(4)(A) in H.R. Rep. 104–622 ("The     examining authorities shall share . . .").

"Asinine" means "unintelligent, stupid, silly, [or] obstinate." *Webster's Third New International Dictionary* 128 (1981). "Asinine" does not mean that a person has violated a non-discretionary legal duty; nor does "asinine" mean that the person has made a decision that is not susceptible to policy judgment.

Plaintiffs fail to identify any other allegations that state or even imply the existence of mandatory duties to obtain records from third parties. In fact, the Complaint is replete with factual allegations suggesting that there were **no** SEC policies regarding requesting information from third parties. The Report quotes a former SEC staff member as stating that the SEC "**always**" obtained Depository Trust Company statements "from the firm" being investigated rather than from the Depository Trust Company itself. (Ex. A at 48, quoting testimony of Demetrios Vasilakis, emphasis added.) The Report also quotes a supervisor as stating that "most of the time we do not send out [requests for trading] confirmations and do asset verification." (Ex. A at 206, quoting testimony of Robert Sollazzo.) As a result of these and other statements, the Report explained it was "common practice" to rely on the firm under investigation, (Ex. A at 48), and that "it was not unusual for [examiners] to rely **exclusively** on records and data produced by the" firm being investigated. (Ex. A at 98, emphasis added; *see also* Ex. A at 191 (noting that "it was not normal practice in the exam program to reach out to entities" that centrally cleared and settled trades).)

Because Plaintiffs' Complaint attempts to incorporate the Report in its entirety, Plaintiffs therefore allege that there was **an absence** of mandatory duties requiring SEC staff to use specific investigative techniques. Although it may have been **good practice** for the SEC to follow up

with third parties, it was not **required** by mandatory SEC policies. (*See* Compl. ¶ 35, citing Ex. A, at 290 n. 202.)

Plaintiffs have therefore failed to plead facts that overcome the discretionary function exception. The statutes, regulations, and caselaw discussed *supra* establish beyond peradventure that the SEC retained full discretion to determine the manner and scope of its investigation. *See Vickers,* 228 F.3d at 951 ("[T]he discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive."). Plaintiffs' allegations fail to rebut this presumption, by identifying either a formal mandatory duty or a specific decision that was not susceptible to policy analysis.

### 3. Assigning Unqualified Staff Members to Investigative Teams

Plaintiffs argue that "several SEC staffers were inexcusably unqualified for their positions," and that the SEC "assigned [ ] staffers who had no understanding of securities transactions, and were otherwise unqualified, to the Madoff investigations." (Surreply at 8, citing Compl. ¶¶ 32, 37, 46, 61–64, 67, 88–89, 100, 118, 126, 132, 134.)

**[8]** It is well-established that "employment, supervision and training" decisions "fall squarely within the discretionary function exception." *Nurse v. United States,* 226 F.3d 996, 1001 (9th Cir.2000); *see also Doe v. Holy See,* 557 F.3d at 1084 ("the decision of whether and how to retain and supervise an employee ... [is] the type of discretionary judgments that the exclusion was designed to protect. We have held the hiring, supervision, and training of employees to be discretionary acts."); *Gager v. United States,* 149 F.3d 918 (9th Cir.1998) ("The [postal service's] decision not to provide universal training

and supervision in mail bomb detection involved judgment or choice grounded in social, economic, and political policy.").

Plaintiffs have failed to identify any allegations that would bring their case outside the purview of the Ninth Circuit's general caselaw on this question. Accordingly, Defendant has satisfied its burden of showing that the relevant decisions fall within the discretionary function exception, and Plaintiffs have not alleged any facts to the contrary.

### 4. Staff Members' Personally Motivated Acts

Plaintiffs argue that SEC "staffers [ ] acted out of personal animus, unfounded fear of individual liability, and improper deference to Madoff on account of his reputation," and that "one staffer ignored a whistleblower out of spite." (Surreply at 8, citing Compl. ¶¶ 23, 97–99, 119, 121–22.)

All of these assertions strike at the **manner** in which the SEC conducted its investigations. As noted repeatedly in this Order, the SEC retained discretion to make policy-based decisions about the **manner** and **scope** of its investigations. *See* 15 U.S.C. § 78u(a)(1) (permitting SEC to decide "as it deems necessary" how to "investigate any facts, conditions, practices, or matters," whether through "a statement in writing, under oath or otherwise."); *see also Vickers*, 228 F.3d at 951 ("[T]he discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive.").

Plaintiffs' allegations, taken as true, at most establish that the SEC staff abused its discretion when conducting investigations into Madoff's operations. However,

the FTCA clearly states that the discretionary function applies "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In addition, Supreme Court precedent requires this Court to examine "the nature of the actions taken and [ ] whether they are susceptible to policy analysis," not "the agent's **subjective intent** in exercising the discretion conferred by statute or regulation." *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267 (emphasis added). Accordingly, the SEC staff's subjective reasons for deciding how to investigate Madoff are irrelevant to the present inquiry.[18]

Furthermore, the relevant question is not, as Plaintiffs suggest, whether the agents' activities were **actually** "grounded in any legitimate policy considerations." (Surreply at 9.) Rather, the question is whether the agents' activities were **susceptible** to policy analysis. *See Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267; *Terbush*, 516 F.3d at 1129. Investigative decisions are inherently susceptible to policy analysis, and Plaintiffs fail to identify any mandatory laws, regulations, or policies that prescribe a specific course of action for the staff to follow when conducting investigations. Accordingly, these decisions are subject to the discretionary function exception.

### 5. Failing to Follow Case–Management Procedures

Plaintiffs next argue that the SEC "violated its own internal policies" regarding case-management by doing the following: (1) "failing to obey rules regarding the filing of reports and the use of the SEC's STARS [Super Tracking and Reporting System] computer system," (2) failing to consult the Super Tracking and Reporting

---

18. To the extent that SEC staff members were truly acting for personal purposes, such activities would not constitute a "negligent or wrongful act or omission of any employee of

the Government while acting **within the scope** of his office or employment," and the FTCA would not provide an avenue for recovery. 28 U.S.C. § 1346(b)(1) (emphasis added).

System database before beginning examinations, (3) "fail[ing] to submit Matter Under Inquiry [ ] reports with respect to . . . open investigations," and (4) failing to file case-opening and case-closing reports. (Surreply at 7.)

Plaintiffs have adequately alleged that the SEC teams failed to conduct each of these tasks at one time or another. Plaintiffs have not, however, adequately alleged that these tasks were **mandatory** or were not otherwise susceptible to **policy judgment.** Because the SEC staff had broad discretion to determine how to conduct its investigations, *see supra* Part IV.B, Plaintiffs bear the burden of identifying plausible allegations that non-discretionary duties were imposed on the investigators. *See, e.g., Sabow,* 93 F.3d at 1452–53 (closely examining Naval Investigative Service/Judge Advocate General investigation manuals to determine whether investigators were obligated to conduct investigations in particular manner); *Alfrey v. United States,* 276 F.3d 557, 563 (9th Cir. 2002) (holding that prison guard's failure to search a computer database was part of discretionary investigatory decision where there was no policy requiring such a search to be conducted); *cf. Franklin Sav. Corp. v. United States,* 180 F.3d 1124, 1132–33 (10th Cir.1999) (agency not immune where its employees failed to prepare mandatory case memoranda; however, plaintiff's claims were dismissed on the merits because no injury flowed from the failure to prepare the memoranda). Plaintiffs have not met their burden.

### a. Factual Allegations

In May 2003, the Washington-based Office of Compliance Inspections and Examinations received a tip and referred the matter to a team in the Broker–Dealer section. In December 2003, the Washington team received a second tip and opened its investigation into Madoff. According to Plaintiffs, the team failed to file case-open-

ing report in the STARS computer system. (Compl. ¶ 80.) There is one allegation suggesting that case-opening report is mandatory: the Report quotes a supervisor's statement that the staff members were "supposed to" enter their case-opening "information into the tracking system." (Ex. A at 132, quoting McCarthy testimony.) The Washington team also failed to follow its case-planning memo. (Compl. ¶ 69.) There are no factual allegations, however, that there is a mandatory duty to follow a case-planning memorandum.

In April 2004, the Washington team closed its investigation and failed to file a case-closing memorandum. (Compl. ¶¶ 78, 80.) There is one allegation that the case-closing memo may have been mandatory: the Report quotes a supervisor's statement that "[t]ypically, staff is supposed to—when they finish an exam[ination] they're supposed to close it out and I think there should have been a close-out memo is my understanding." (Compl. ¶ 78 & n. 15, quoting Ex. A at 136 (quoting McCarthy testimony).)

At the same time that the Washington team closed its investigation (April 2004), the first New York enforcement team received a tip, and in December 2004 the New York team opened its investigation. (Compl. ¶ 86.) This team failed to draft a planning memorandum. (Compl. ¶¶ 87, 108.) Plaintiffs state in a conclusory fashion that there was an SEC "policy or practice" requiring such a memorandum, but support this assertion by citing to a factual statement in the Report that quotes staff members saying that there was **not** such a policy at the time of the investigation. (Compl. ¶ 87, citing Ex. A at 166.)

The New York team failed to consult the STARs computer system to see if any prior case-opening reports had been filed. (Compl. ¶¶ 103, 108.) There is no specific

allegation that there is a mandatory duty to check the computer system; however, Plaintiffs allege that SEC policy required that "there should never be two examinations of the same entity being conducted at the same time without both teams being aware of each other's examination." (Compl. ¶ 103, quoting Ex. A at 132.) In the Ninth Circuit, the word "should" is generally viewed as **suggestive** rather than **mandatory,** *see, e.g., Sabow,* 93 F.3d at 1452, and a person's **subjective belief** that something "should" be done is inadequate evidence that there is "in fact [a] mandatory [duty] under some federal regulation or [internal] policy." *Alfrey,* 276 F.3d at 563. However, viewing this quotation in the light most favorable to Plaintiffs, there may be a plausible inference that there was a mandatory policy to check the STARs computer system or that the decision to check the STARs computer was not susceptible to policy analysis. (*See* surreply at 12, 25.) Plaintiffs therefore allege that the Washington and first New York teams violated internal policies and/or made decisions that were not susceptible to policy judgment. These acts and omissions will be examined in greater detail *infra.*

Plaintiffs further allege that the first New York team learned about the previous Washington examination while the New York team was interviewing Madoff in mid-to-late May 2005. (Ex. A at 195.) In early June 2005, the Washington team sent its files to the New York team, and the New York team performed a "cursory review" of the Washington team's findings because the information "seemed so similar to what we [the New York team] were receiving in real time." (Compl. ¶ 105, quoting Ex. A at 200.) Plaintiffs allege that the two teams' failures to fully communicate "resulted in embarrassment and a waste of Commission resources as two examination teams from two different offices essentially conducted the same exam-

ination." (Ex. A at 142; *see also* Compl. ¶ 1 n. 3 (incorporating Report in its entirety into Complaint).)

In September 2005, the first New York team formally closed its investigation. In October 2005, after Harry Markopolos's third report was referred from the Boston office, a different New York team began a new investigation into Madoff's operations. In December 2005, this second New York team filed its "Matter Under Inquiry" report. (Compl. ¶ 124.) The New York office received another tip about Madoff between the October 2005 opening of the investigation and the December 2005 filing of the Matter Under Inquiry report. (Compl. ¶ 125.) Plaintiffs allege that, had the Matter Under Inquiry been filed in October, this new tip would have been part of the second New York team's investigation. (Compl. ¶ 125.) However, there are no factual allegations that SEC policy requires that a Matter Under Inquiry form be filed immediately, other than Plaintiffs' conclusory allegations that this a "required step at the beginning of any Enforcement investigation." (Compl. ¶ 124.) Contradicting this conclusory assertion, Plaintiffs' Complaint contains specific factual assertions that, although the Matter Under Inquiry "should" have been opened sooner, the SEC's enforcement manual states that staff members "**may**" file a Matter Under Inquiry if and when they determine that a complaint is "serious and substantial." (Compl. ¶ 125, citing Ex. A at 263 (quoting SEC Enforcement Manual) (emphasis added).) Plaintiffs further allege that "it is unclear whether the tip would have made any difference in the conduct or the result of the [second New York team's] investigation because ... of [the investigating attorney's] view that anonymous tips, 'on their face' were not credible." (Ex. A at 265; *see also* Compl. ¶ 1 n. 3 (incorporating Report in its entirety into Complaint).)

In June 2006, after completing its examination, the second New York team filed its case-closing report despite the fact that it had failed to resolve all of the red flags it identified. (Compl. ¶ 147.) However, there are no allegations that the SEC staff is required to resolve red flags before deciding to close a case and file a case-closing report. (*See* Compl. ¶ 147.)

### b. Discussion and Analysis

In short, viewing the plausible inferences of the Complaint's factual averments in favor of Plaintiffs, the Complaint alleges three acts that violated mandatory duties and/or were not susceptible to policy judgment:

(1) the Washington team failed to file a case-opening report;

(2) the first New York team failed to consult the STARs computer database to find prior case-opening reports regarding Madoff; and

(3) the Washington team failed to file a case-closing memorandum.

Plaintiffs' other assertions are either unsupported by any factual allegations whatsoever [19] or are supported by factual allegations that plainly contradict Plaintiffs' conclusory assertions that there was a mandatory duty and/or decision not susceptible to policy analysis.[20] Plaintiffs further allege that the three specific SEC omissions had an extremely limited impact. Plaintiffs assert that the New York team, prior to closing its investigation, received and reviewed the Washington files—albeit in a "cursory" manner because the information appeared duplicative of the New York team's ongoing investigations. (Compl. ¶ 105, citing Ex. A at 200.)

Ultimately, then, Plaintiffs are alleging that two SEC offices violated mandatory policies and thereby failed to adequately coordinate their investigations and otherwise conduct their investigations in a thorough and adequate manner.

As has been shown repeatedly throughout this Order, the SEC retained discretion to decide how to conduct its investigations—which includes decisions about how to coordinate investigations between offices. (*See supra* Parts. IV.B.1, IV.B.3.) At the risk of being repetitive, it is useful to refer back to 15 U.S.C. § 78u(a)(1), which permits the SEC to decide "as it deems necessary" how to "investigate any facts, conditions, practices, or matters," whether through "a statement in writing, under oath or otherwise." In addition, 15 U.S.C. § 78u(d)(1) permits the SEC "in its discretion" to bring an enforcement action when it detects a securities violation during its investigations. There are, in short, no mandatory obligations requiring the SEC to conduct its investigations in a particular manner or to bring an enforcement action in particular situations. These decisions are fundamentally discretionary and require staff to make policy-based judgments. *See, e.g., Sloan*, 236 F.3d at 762 ("[T]he sifting of evidence, the weighing of its significance, and the myriad other decisions made during investigations plainly involve elements of judgment and choice."); *Vickers*, 228 F.3d at 951 ("[T]he discretionary function exception protects

---

**19.** There are no specific allegations stating that there was a requirement to follow a case-planning memorandum. Nor are there specific allegations stating that there was a requirement to resolve red flags prior to closing a case and preparing a case-closing memorandum.

**20.** Plaintiffs' conclusory assertions that there were mandatory duties are contradicted by their specific allegations in the Report that there was no policy requiring staff to prepare a case-planning memorandum and there was a discretionary policy (which used the suggestive "should" and the permissive "may," *see Sabow*, 93 F.3d at 1452) regarding staff members' decisions to file a Matter Under Inquiry report.

agency decisions concerning the scope and manner in which it conducts an investigation.").

In light of this broad investigatory discretion, *General Dynamics* is therefore directly on point regarding the small handful of mandatory procedural obligations imposed on SEC staff. In *General Dynamics,* the Ninth Circuit explained that an otherwise actionable agency decision is immune from suit if "a totally separate exercise" of "independent" and "broad based discretion" "intervenes between an alleged government wrongdoer and the harm suffered by a plaintiff." 139 F.3d at 1285. There, prosecutors brought a criminal action against General Dynamics based solely on facts stated in a negligently prepared auditing statement. The court explained that the prosecutors' affirmative decision to prosecute constituted an independent exercise of broad-based discretion that thereby insulated the government from a lawsuit based on the auditors' non-discretionary actions. *Id.* The court noted that the "source of the [plaintiff's] injury" was the independent and "discretionary" decision to prosecute. *Id.* Although the prosecutors could have sought more information and could have double-checked the auditors' reports, they retained discretion to choose whether or not to do so, and they affirmatively decided to rely only on the inaccurate reports. *Id.*

In contrast, in *Glacier Bay,* hydrographers prepared oceanographic charts pursuant to mandatory requirements stated in their handbook. They then presented these charts to their supervisor, who had discretion regarding whether or not to approve those charts. The court held that the supervisor's limited exercise of discretion did not immunize the hydrographers' negligent preparation of the charts in violation of mandatory guidelines. As the court later explained in *General Dynamics,* "little intervened between the hydrographers' wrongdoing and the injury to the plaintiff." *General Dynamics,* 139 F.3d at 1285. Instead, there was a "tight coupling between hydrographers, reviewers, charts, and results," such that the plaintiff was injured by the hydrographers' violation of the mandatory guidelines in preparing the charts, and was not injured by the supervisor's discretionary approval of the charts. *Id.* at 1284.

The allegations in the present case are far more analogous to the facts in *General Dynamics* than in *Glacier Bay.* Plaintiffs allege in essence that the first New York investigative team had a mandatory duty to be aware of the prior Washington investigation. Plaintiffs' allegations are neatly summarized in a quotation in the Complaint: under SEC policy "there should **never** be two examinations of the same entity being conducted at the same time without both teams being aware of each other's examination." (Compl. ¶ 102, quoting Ex. A at 132, emphasis added by Court.) [21]

However, even though these two teams' conduct violated mandatory policies or otherwise involved non-judgment-based decisions, the discretionary function exception will apply if "a totally separate exercise" of "independent" and "broad based discretion" "intervenes between an alleged government wrongdoer and the harm suffered by a plaintiff." *General Dynamics,* 139 F.3d at 1285. Here, Plaintiffs were

---

**21.** Again, the Court notes that the word "should" is suggestive rather than mandatory and officials' subjective beliefs are insufficient evidence of a mandatory policy. However, at the present stage of proceedings, plausible inferences in the Complaint must be drawn in Plaintiffs' favor. This quotation, combined with the other factual allegations discussed *supra,* provide a plausible inference that these particular case-management obligations were mandatory.

harmed by the investigators' failure to discover the Madoff fraud and publicize or prosecute it. Plaintiffs were not harmed by the teams' failure to follow case-management procedures because the first team of New York investigators undertook an independent exercise of discretion when they (1) received and reviewed the Washington team's files and determined that the Washington team's investigative materials were duplicative of their own investigation (Compl. ¶ 105, quoting Ex. A at 200), (2) conducted their own independent investigation into Madoff's operations (Compl. ¶¶ 82–109), and (3) determined that there was no basis for bringing an enforcement action against Madoff (Compl. ¶ 107).

Each of these three acts by the New York team was a "totally separate exercise of discretion" that was unrelated to the investigators' non-discretionary violations of mandatory case-management rules. *See General Dynamics*, 139 F.3d at 1285. The New York investigators retained "broad based discretion," *id.* at 1285, to select the manner and scope of their investigation of Madoff and their review of the Washington team's files. This "broad based discretion" is derived both from the SEC's congressionally-authorized discretion to choose the manner and scope of its investigations, *see* 15 U.S.C. §§ 78u(a)(1), 78u(d)(1), and from the inherently discretionary nature of investigative activities. *See, e.g., Sloan,* 236 F.3d at 762 ("[T]he sifting of evidence, the weighing of its significance, and the myriad other decisions made during investigations plainly involve elements of judgment and choice."); *Vickers,* 228 F.3d at 951 ("[T]he discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation.").

In addition, the New York team, after conducting an independent and discretionary review of both Madoff's operations and the Washington team's files, made an independent decision to close its investigation in September 2005 without bringing an enforcement action against Madoff. The decision of whether or not to bring an enforcement action is plainly discretionary. *See* 15 U.S.C. § 78u(d)(1) (permitting SEC "in its discretion" to bring enforcement actions); 17 C.F.R. § 202.5 (stating that SEC "may in its discretion" select from various enforcement tools if it believes that enforcement action is necessary). Although FTCA claims most often involved negligent agency **actions** rather than **failures** to act, the New York team's decision **not to act** was fully within its discretion in selecting the manner and scope of its investigations and enforcement actions. *See, e.g., Block v. SEC,* 50 F.3d at 1084 (in Administrative Procedures Act action, SEC cannot be compelled to undertake certain enforcement actions); *Board of Trade v. SEC,* 883 F.2d at 531 (same); *Leytman v. New York Stock Exchange,* 1995 WL 761843, at *3 (dismissing FTCA claims alleging that SEC failed to investigate alleged wrongdoing).

In short, *General Dynamics* applies to the allegedly negligent acts by the Washington team and the first New York team. The New York team's intervening discretionary actions are closely analogous to the *General Dynamics* prosecutors' actions in at least two ways:

(1) In *General Dynamics,* the prosecutors reviewed and relied on information contained in a negligently-conducted investigation when choosing to pursue a prosecution. Here, the first New York team reviewed the Washington team's allegedly negligently-prepared files and the New York team relied (at least part) on those files in choosing to close the case without pursuing an enforcement action. In both cases, the second actor retained discretion to decide how thoroughly to rely on (or discredit) the underlying information re-

ceived from a previous investigation. In both cases, the second actor exercised that discretion: in *General Dynamics*, the prosecutors elected not to conduct a further investigation, and here, the New York team elected to conduct a "cursory" review of the Washington team's files.

(2) In *General Dynamics*, the prosecutors retained discretion to conduct additional independent investigations before deciding whether or not to file a criminal action; they elected to file the action without seeking additional information beyond that contained in the auditing reports. Here, the first New York team retained discretion to conduct further investigations into Madoff's affairs before deciding whether or not to bring enforcement actions against Madoff. Unlike the prosecutors in *General Dynamics*, the New York team elected to conduct additional independent investigations beyond those contained in the Washington team's files, and the New York team further elected to close its case without bringing an enforcement action.[22] The New York team in fact exercised greater discretion than the prosecutors in *General Dynamics*—the prosecutors in *General Dynamics* were presented with clear (albeit incorrect) evidence showing fraud; it does not exactly require "a robust exercise of discretion" to decide to prosecute that fraud. 139 F.3d at 1285. Here, however, neither the Washington team nor the New York team uncovered any actionable wrongdoing. Accordingly, the New York team exercised relatively "robust" discretion by deciding to investigate the allegations further and ultimately

concluding on the basis of that investigation not to bring an enforcement action.

Thus, the New York team's actions—its affirmative choice to review the Washington team's files; its affirmative choice to conduct additional investigations into Madoff's operations; and its affirmative choice not to bring an enforcement action—constituted intervening exercises of independent and broad-based discretion. Both the facts and holding of *General Dynamics* are directly on-point. As such, the discretionary function exception bars Plaintiffs' claims regarding the Washington and New York investigators' alleged failures to follow mandatory case-management procedures.

### 6. Conclusion Regarding Plaintiffs' Purportedly Mandatory Duties

Plaintiffs have failed to identify any of the SEC's non-discretionary acts that are actionable under Ninth Circuit precedent. As such, they have not rebutted the "strong presumption" established in the statutes, regulations, and caselaw in Defendant's favor. *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267. The discretionary function exception bars Plaintiffs' claims.

### V. PLAINTIFFS' REQUEST TO CONDUCT DISCOVERY

Plaintiffs insist that as-yet-undiscovered internal policies and guidelines will reveal that the SEC's actions violated clear mandatory rules. (Surreply at 9, 11.) However, Plaintiffs have not plausibly alleged any facts suggesting that such mandatory rules exist. In addition, Plaintiffs have failed to

---

**22.** Even though Plaintiffs allege that the New York team's review of the Washington team's files was "cursory," the *General Dynamics* court clearly explained that it is inappropriate to consider the thoroughness or accuracy of an intervening exercise of "broad based discretion." *See* 139 F.3d at 1285. The *General Dynamics* prosecutors "**could have** had even more information if they had chosen to pur-

sue it." *Id.* (emphasis added). Likewise, the first New York team **could have** conducted additional investigations into Madoff's operations or reviewed the Washington team's files more thoroughly. However, the first New York team retained "broad based discretion" to choose the methods and scope of its investigation.

identify the specific types of rules that are likely to exist. Finally, Plaintiffs have failed to consult the voluminous public record that might bolster their conclusory assertions or potentially contradict them. In short, Plaintiffs have failed to allege sufficient "facts to raise a reasonable expectation that discovery will reveal evidence" supporting their conclusory assertions. *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. This Court is barred from "unlock[ing] the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal,* 129 S.Ct. at 1950. Accordingly, discovery is inappropriate at this juncture.

### A. LEGAL STANDARD

**[9]** "[W]here pertinent facts bearing on the question of jurisdiction are in dispute, discovery should be allowed." *Am. West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 801 (9th Cir.1989). However, a "court's refusal to allow further discovery before dismissing on jurisdictional grounds is not an abuse of discretion 'when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction.'" *Id.* at 801 (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 430–31, n. 24 (9th Cir.1977)).

In the FTCA immunity context, "[i]t is well-established that 'the burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists.'" *Gager v. United States,* 149 F.3d 918, 922 (9th Cir.1998) (quoting *Conkle v. Jeong,* 73 F.3d 909, 914 (9th Cir.1995)) (internal alterations omitted). In this regard, it is important to remember that the Rule 8 pleading requirements prevent parties from filing complaints in order to conduct aimless fishing expeditions in the hope that some helpful evidence might possibly be uncovered. *See Ashcroft v. Iqbal,* 129 S.Ct. at 1950 ("Rule 8 . . . does not unlock the

doors of discovery for a plaintiff armed with nothing more than conclusions."); *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955 ("[A]sking for plausible grounds to infer" that a wrongful act occurred requires plaintiff to plead "enough facts to raise a **reasonable expectation** that discovery will reveal evidence of" that wrongful act) (emphasis added).

The Ninth Circuit applied *Twombly* to the discretionary function exception in *Doe v. Holy See,* 557 F.3d at 1084–86. The court affirmed a dismissal under the Foreign Sovereign Immunities Act's discretionary function exception where the defendant made only a "facial attack on the allegations of subject-matter jurisdiction in the complaint." *Id.* at 1086. The court dismissed the complaint because it contained only conclusory assertions that the defendant had adopted a mandatory policy relevant to the cause of action, and the plaintiff wholly failed to "state the terms of this alleged policy, or describe any documents, promulgations, or orders embodying it." *Id.* Notably, the court did not require that the plaintiff have an opportunity to conduct discovery into the existence of this alleged policy. *See id.* at 1084–86. Instead, the court merely analyzed the adequacy of the plaintiff's pleadings, and, finding them to be insufficient under *Twombly,* affirmed dismissal under the discretionary function exception. *Id.* at 1086.

Even prior to the Supreme Court's re-articulation of the proper pleading requirements in *Twombly* and *Iqbal,* it was not unusual for courts to dismiss FTCA claims under the discretionary function exception without giving litigants an opportunity to conduct discovery. *See, e.g., Abreu v. United States,* 468 F.3d 20, 33 (1st Cir. 2006); *Dalli v. Frech,* 70 Fed.Appx. 46 (2d Cir.2003); *see also Mesa v. United States,* 123 F.3d 1435, 1439 (11th Cir.1997) (af-

firming dismissal under discretion function exception where "[plaintiffs] have pointed to no act of these DEA agents that could fall outside of the discretionary function exception, nor have the [plaintiffs] pointed to any requested discovery that could reasonably be expected to reveal any such act."); *accord Razore v. Tulalip Tribes of Wash.,* 66 F.3d 236, 240 (9th Cir.1995) (affirming dismissal of CERCLA action on jurisdictional grounds without permitting parties to conduct discovery); *but see Ignatiev v. United States,* 238 F.3d 464, 467 (D.C.Cir.2001) (holding that D.C. Circuit "require[s] that plaintiffs be given an opportunity for discovery of facts ... [regarding the] existence [or not] of internal governmental policies guiding that action.").[23]

### B. DISCUSSION AND ANALYSIS

**[10]** Additional discovery is not appropriate at present. Plaintiffs have not pleaded "enough facts to raise a reasonable expectation that discovery will reveal evidence of" the sought-after SEC policies and guidelines. *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. In their request for discovery contained in the sur-reply, Plaintiffs have failed to meet their burden of "put[ting] forth sufficient facts to show

that the evidence sought exists." *Gager,* 149 F.3d at 922.

A salient analogy can be found in *Freeman v. United States,* 556 F.3d 326 (5th Cir.), *cert. denied,* —— U.S. ——, 130 S.Ct. 154, 175 L.Ed.2d 39 (2009). In that case, the court held that the "plaintiffs have failed to articulate a discrete discovery request that might cure the jurisdictional deficiency and have failed to otherwise specify where they might discover the necessary factual predicate for subject matter jurisdiction." *Id.* at 342. The *Freeman* case is particularly relevant because it involved a "well-documented" government failure akin to the one at issue in the present case: the government's response to Hurricane Katrina. *Id.* at 343. The court stated that it found "no fault in the district court's conclusion that a mandatory directive, if one existed, could be found in the public realm" because "in this case plaintiffs' allegations are based on statutes, regulations, and other authorities that are publicly available." *Id.* at 342.

*Freeman* is particularly apt because the plaintiffs in that case relied heavily "on numerous congressional investigations regarding the government's response to Hurricane Katrina." *Id.* at 342 n. 16. In the case before this Court, Plaintiffs rely almost exclusively on the SEC Office of

---

**23.** The D.C. Circuit's *Ignatiev* opinion requires that district courts in that Circuit allow FTCA plaintiffs an opportunity to pursue limited discovery to determine whether or not internal agency guidelines mandate staff members to take a particular course of action. It is unclear whether *Ignatiev's* bright-line rule survives post-*Twombly* and -*Iqbal,* both of which state that something more than a conclusory allegation is required to obtain discovery. As the Supreme Court explained in *Iqbal:*

Respondent ... implies that our construction of Rule 8 should be tempered where, as here, the Court of Appeals has "instructed the district court to cabin discovery in such a way as to preserve" petitioners' defense of

qualified immunity "as much as possible in anticipation of a summary judgment motion." Iqbal Brief 27. We have held, however, that the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process. *Twombly,* [550 U.S.] at 559, 127 S.Ct. 1955 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side.").

*Iqbal,* 129 S.Ct. at 1953.

Inspector General's Report. Plaintiffs have done nothing more than read a small portion of the voluminous public record regarding the relevant factual issues.

Notably, Plaintiffs have not shown that the relevant information is unavailable to them in the absence of discovery. To the contrary, the SEC Inspector General has issued a follow-up report that specifically examines the Office of Compliance Inspections and Examinations's "modules, policies, procedures and guidance associated with the conduct of its examinations" into Madoff's conduct. The Court further notes that countless other relevant documents are readily available through the SEC's website.

Accordingly, Plaintiffs' request for discovery is denied.

## VI. LEAVE TO AMEND THE COMPLAINT

When a court grants a motion to dismiss, the court may grant the plaintiff leave to amend a deficient claim "when justice so requires." Fed.R.Civ.P. 15(a)(2). The plaintiff need not specifically request leave to amend. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995); *but see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir.2006) ("Although Plaintiffs' complaint is susceptible of amendment, we generally will not remand with instructions to grant leave to amend unless the plaintiff sought leave to amend below.") (citing *Alaska v. United States*, 201 F.3d 1154, 1163–64 (9th Cir. 2000)). "Five factors are frequently used to assess the propriety of a motion for leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether

plaintiff has previously amended his complaint." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir.1990) (citing *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir.1989)).

It is disfavored to prevent a plaintiff from amending the complaint at least once, and Defendant has not introduced any evidence showing that amendment would be entirely futile. Accordingly, Plaintiffs are granted 30 days to amend their Complaint and incorporate plausible factual allegations showing that the SEC failed to conform to its mandatory duties.

[11] Plaintiffs are cautioned that an amended complaint supercedes a previous complaint. *See, e.g., Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1546 (9th Cir.1990); *see also* Local Rule 15–2. When an amended complaint is filed, the previous complaint is rendered null and void, and only the amended complaint remains legally operable. Under this rule, "a plaintiff waives all causes of action alleged in the original complaint which are not alleged in the amended complaint." *London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir.1981). Accordingly, if Plaintiffs wish to preserve their original arguments for appeal, Plaintiffs are advised to restate those allegations in their amended complaint.[24] However, in order to expedite future proceedings, the Court orders Plaintiffs to **clearly identify** any modifications, additions, or deletions in their amended complaint.

While preparing the amended complaint, Plaintiffs are advised that Fed.R.Civ.P. 11(b) requires that the factual allegations be made "to the best of the person's knowledge, information, and belief, formed

---

**24.** Given the voluminous nature of the original complaint, the Court grants Plaintiffs permission to incorporate their original allegations by reference into the amended complaint. The Court anticipates, however, that

the "law of the case" doctrine may preclude reconsideration of the specific allegations addressed in the present Order. *See, e.g., United States v. Smith*, 389 F.3d 944, 948–50 (9th Cir.2004).

after an inquiry reasonable under the circumstances." Obviously this rule does not require Plaintiffs' amended complaint to contain factual support of the type required in a Rule 56 summary judgment motion. But in the present context, in order for Plaintiffs' pre-filing "inquiry" to be "reasonable under the circumstances," they are expected to make a good faith examination of the publicly available documents and allege **only** those facts that are reasonably likely to find evidentiary support during discovery. Plaintiffs shall refrain from submitting additional conclusory allegations regarding unnamed "policies and practices." Plaintiffs shall also refrain from submitting new allegations that are contradicted by facts stated in any of the SEC's Office of Inspector General reports unless Plaintiffs can also plausibly allege that such reports are inaccurate or incomplete. Plaintiffs shall identify, to the best of their ability, the specific type of conduct governed by the alleged policies and the specific time period during which the policies were effective.

Plaintiffs are advised that if they are unable to make a sufficient good faith inquiry within 30 days, their action will be dismissed without prejudice for lack of subject matter jurisdiction. *See Frigard v. United States*, 862 F.2d 201, 204 (9th Cir.1988) (per curiam); Fed.R.Civ.P. 41(b). Because dismissal for lack of subject matter jurisdiction is ordinarily without prejudice, Plaintiffs may not necessarily be barred from reinstating the action in the future. *See* Wright & Miller, *Federal Practice & Procedure* § 1350 & nn. 61–62 (collecting cases).

## VII. CONCLUSION

Accordingly, Defendants' Motions to Dismiss for lack of subject matter jurisdiction are GRANTED. Plaintiffs may file an amended complaint containing new allegations that are reasonably aimed at satisfying Plaintiffs' burden as described in this Order. If Plaintiffs choose to file an amended complaint, the amended complaint must be filed within 30 days of the date that this Order is entered on the docket. Should Plaintiffs fail to file an amended complaint, the action will be dismissed without prejudice for lack of subject matter jurisdiction.

IT IS SO ORDERED.

